## HAWLEY v. DILLER.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 116. Submitted February 2, 1900.—Decided May 28, 1900.

An applicant for public land under the act of Congress of June 3, 1878, 29 Stat. 89, c. 151, known as the Timber and Stone Act, must support his application by an affidavit stating that " he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the Government of the United States should inure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the register or receiver of the land office within the district where the land is situated." The same act provides: " If any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he may have paid for said lands, and

all right and title to the same; and any grant or conveyance which he may have made, *except in the hands of bona fide purchasers*, shall be null and void."

An entryman under this act acquires only an equity, and a purchaser from him cannot be regarded as a bona fide purchaser within the meaning of the act of Congress unless he become such after the Government, by issuing a patent, has parted with the legal title.

A construction of the above act long recognized and acted upon by the Interior Department should not be overthrown unless a different one is plainly required by the words of the act.

The result of the decisions of this court in relation to the jurisdiction of the Land Department when dealing with the public lands is as follows: (1) That the Land Department of the Government has the power and authority to cancel and annul an entry of public land when its officers are convinced, upon a proper showing, that the same was fraudulently made; (2) that an entryman upon the public lands only secures a vested interest in the land when he has lawfully entered upon and applied for the same, and in all respects complied with the requirements of the law; (3) that the Land Department has control over the disposition of the public lands until a patent has been issued therefor and accepted by the patentee; and (4) that redress can always be had in the courts where the officers of the Land Department have withheld from a preëmptioner his rights, where they have misconstrued the law, or where any fraud or deception has been practiced which affected their judgment and decision.

The principle reaffirmed that where the matters determined by the Land Office "are not properly before the Department, or its conclusions have been reached from a misconstruction by its officers of the law applicable to the cases before it, and it has thus denied to parties rights which, upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practiced, necessarily affecting its judgment, then the courts can, in a proper proceeding, interfere and control its determination so as to secure the just rights of parties injuriously affected."

Sections 2450 to 2457 inclusive of the Revised Statutes, relating to suspended entries of public lands and to suspended land claims, and which sections require certain matters to be passed upon by a Board consisting of the Secretary of the Interior and the Attorney General, construed and held to apply only to decisions of the Land Office sustaining irregular entries, and not to decisions rejecting and cancelling such entries under the general authority conferred upon the Land Department in respect to the public lands.

THE case is stated in the opinion of the court.

*Mr. Charles K. Jenner* for appellants. *Mr. A. B. Browne* was with him.

No brief filed for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case involves a claim to a tract of land arising out of an entry made under the act of Congress of June 3, 1878, c. 151, entitled "An act for the sale of timber lands in the States of California, Oregon, Nevada and in Washington Territory," known as the Timber and Stone Act. 20 Stat. 89.

The act in its first section provided for the sale at a named price and in quantities not exceeding one hundred and sixty acres to any person or association of persons of surveyed public lands in the States and Territory named, not included within the military, Indian and other reservations, and which were "valuable chiefly for timber, but unfit for cultivation." It also provided for the sale of lands "valuable chiefly for stone" on the same terms as timber lands.

By the second section of the act it was provided: "§ 2. That any person desiring to avail himself of the provisions of this act shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the General Land Office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation, and valuable chiefly for its timber or stone; that it is uninhabited; contains no mining or other improvements, except for ditch or canal purposes, where any such do exist, save such as were made by or belonging to the applicant, nor, as deponent verily believes, any valuable deposit of gold, silver, cinnabar, copper or coal; that deponent has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the Government of the United States should inure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the

register or receiver of the land office within the district where the land is situated; and if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he may have paid for said lands, and all right and title to the same; and any grant or conveyance which he may have made, *except in the hands of bona fide ·purchasers*, shall be null and void."

The third section, after making provision for the publication of the application to purchase, provides: "And upon payment to the proper officer of the purchase money of said land, together with the fees of the register and the receiver, as provided for in case of mining claims in the twelfth section of the act approved May 10, 1872, the applicant may be permitted to enter said tract, and, on the transmission to the General Land Office of the papers and testimony in the case, a patent shall issue thereon: *Provided*, That any person having a valid claim to any portion of the land may object, in writing, to the issuance of a patent to lands so held by him, stating the nature of his claim thereto; and evidence shall be taken, and the merits of said objection shall be determined by the officers of the land office, subject to appeal, as in other land cases. Effect shall be given to the foregoing provisions of this act by regulations to be prescribed by the Commissioner of the General Land Office."

The bill of complaint presents substantially the following case under the above legislation:

On the 30th day of April, 1883, after having complied with the requirements of the above act, one Henry C. Hackley paid to the receiver of the land office in Olympia, Washington Territory, the purchase price of the N. W. ¼ of the N. E. ¼ and the N. ½ of the N. W. ¼ of section 13, and the S. E. ¼ of the S. W. ¼ of section 12, all in township 36 north, of range 3 east, Willamette meridian, in the county of Skagit, Territory (now State) of Washington—taking from the receiver what is known as the final or duplicate receipt. On the same day Hackley conveyed the tract described to Stephen S. Bailey by a sufficient deed of warranty; and on December 29, 1887, Bailey sold, transferred and conveyed the land to the appellants.

On August 9, 1888, the Commissioner of the General Land Office suspended and held for cancellation the entry made by Hackley, it having been reported to that office by a special agent that the land in question was not chiefly valuable for timber, but was valuable agricultural land, and also that the entry by Hackley was made in the interest of Bailey.

On or about August 23, 1888, the register and receiver of the local land office at Seattle caused notice of the action of the Commissioner of the General Land Office to be served upon the transferees, the notice stating in detail the fact of the entry by Hackley, and that the special agent had reported that he had made a personal examination of the land and found that it was not chiefly valuable for timber, but was valuable agricultural land, and that the entry thereof was made in the interest of Bailey and others, and not for the benefit and use of the entryman.

Within sixty days after the above notice, the transferees made a special appearance by attorneys, and moved that the proceeding be dismissed and the entry reinstated and passed to patent, upon the ground that the action of the Commissioner was in excess of any authority possessed by him or by the Land Department. That motion was denied by the Commissioner. The bill alleges that such denial was not the result of the consideration of any fact or facts, but of an erroneous opinion of the law.

Thereupon the transferees applied for a hearing in accordance with the notice given, and they stipulated with the attorney for the Government that the case be consolidated with eleven other entries owned by them and which were suspended at or about the same time by the Commissioner.

That application was granted, and a hearing was had before the local land office.

The register and receiver being divided in opinion the matter went to the Commissioner, who decided that all the land embraced in the entries before him, including the land here in question entered by Hackley, was timber land that could be entered as such under the act of June 3, 1878; that all of the proceedings in relation to Hackley's entry were regular; that

the proof submitted on the entry was sufficient; and that the Government had failed to prove that that entry was made in the interest of Bailey or of any other person than the entryman. It was therefore ordered by that officer that the entry in question be removed from suspension and remain intact upon the records of the Land Department, and that the patent of the United States issue therefor.

Subsequently, January 31, 1891, no patent having been issued, Secretary Noble ordered the Commissioner of the General Land Office to certify and transmit all the papers and testimony in the cause to his office. "Said order," the bill alleged, "was made by the said Secretary of the Interior without any appeal being taken by the United States, and without notice to said transferees, or any of the defendants in said cause." The order was complied with, but the papers remaining in the hands of Secretary Noble without any decision being made by him while in office. The case was taken up by his successor, Secretary Smith, and was decided October 19, 1893, adversely to the transferees. *United States* v. *Bailey,* 17 L. D. 468. The bill further alleged: "Said decision of the Commissioner of the General Land Office, rendered in said cause as aforesaid, was at no time considered by the honorable Secretary of the Interior and the Attorney General of the United States, acting as a board or otherwise, nor was the testimony and proceedings in said cause by them considered or acted upon, as a board, at all; nor did the Attorney General of the United States at any time consider or act upon said decision of the Commissioner of the General Land Office, or the pretended testimony, or the papers and documents in relation to said entry, at all, either as a member of a board or in his individual capacity."

Throughout all these proceedings appellants protested that the Land Office was without jurisdiction or authority to cancel the entries of the lands that had been transferred to them.

In the course of his opinion Secretary Smith said that there was no charge nor was there any testimony affecting the transaction between Bailey and his transferees. He also said that his interpretation of the statute did not imply that a timberland entryman was not authorized to sell his entry at any time

that he chose after he had made his proof and received his certificate. 17 L. D. 468, 471, 476.

In accordance with the directions of the Secretary, the Commissioner of the General Land Office, on November 21, 1893, ordered the cancellation of the timber-land entry of Hackley upon the records of the Land Department, and the land was held subject to entry as public land of the United States.

Thereafter Diller, the present appellee, made entry of and purchased the land in question under the above act of June 3, 1878, and a patent therefor from the United States, bearing date October 15, 1895, was issued to him.

On February 21, 1896, the plaintiffs, now appellants and the transferees of Bailey, brought this suit against Diller in the Circuit Court of the United States for the District of Washington, Northern Division. The bill, after setting forth the above and other facts, alleged that the action of the Land Department in regard to the entry in question was without authority of law and that the patent to Diller was wrongfully issued.

The relief asked was a decree holding the patent of the defendant to be a cloud upon the title of the plaintiffs, adjudging that the defendant held the title in trust for them, and requiring him to convey to them whatever title he might have obtained or acquired by virtue of such patent; that the title of the plaintiffs to the land be forever quieted against the defendant; and that such further relief be granted in the premises as might be equitable.

A demurrer to the bill having been overruled, the defendant filed both a plea and an answer. After referring to the hearing before the receiver and the register, resulting in a division of opinion between those officers, the plea recited as a defence the history of the proceedings as above stated, and the entry of the land and the issue of a patent to the defendant after the cancellation of Hackley's entry. The plea was overruled. In his answer the defendant questioned the good faith and sufficiency of the conveyances from Hackley to Bailey and from Bailey to the plaintiffs. A replication was filed by the plaintiffs in which they asserted the truth and sufficiency in law of their bill, and

made a countercharge of insufficiency, untruthfulness and un-
certainty as to the defendant's answer.

Upon final hearing in the Circuit Court Judge Hanford held
that where land had been regularly entered under the act of
June 3, 1878, it was not subject to forfeiture after it had been
conveyed to a *bona fide* purchaser; that the opinion of the Sec-
retary of the Interior showed that the original entry in ques-
tion was cancelled solely because it was deemed fraudulent, and
no consideration whatever was given to the rights of the plain-
tiffs as *bona fide* purchasers; and that the evidence clearly
showed that the plaintiffs were *bona fide* purchasers within the
meaning of the act of Congress referred to. The Circuit Court
was also of opinion that "the case in the Land Department,
after the entry had been suspended, should have been adjudi-
cated by the board composed of the Attorney General, the
Secretary of the Interior and the Commissioner of the General
Land Office, as provided by sections 2450 and 2451, Revised
Statutes, and the Secretary of the Interior, without a determi-
nation of the board, could not lawfully cancel the entry." A
decree was therefore entered adjudging the plaintiffs to be the
equitable owners in fee and entitled to the lands described in
the bill; that the patent issued to the defendant Diller for the
land in question was issued improvidently and without authority
of law, was a cloud upon the title of the plaintiffs, and should
be removed; and that whatever title might have accrued under
or through such patent was held by the defendant in trust for
the use and benefit of the plaintiffs. It was further adjudged
that the defendant should convey to the plaintiffs, by good and
sufficient deed, whatever of title he might have acquired under
and by virtue of the patent, free and clear of any and all in-
cumbrance, within ten days from the filing of the decree, and
the master was authorized to make the conveyance in the event
of his failure or refusal so to do; and the title of the plaintiffs
to the land was declared to be forever quieted as against the
defendant. *Hawley* v. *Diller*, 75 Fed. Rep. 946.

The defendant appealed and the decree of the Circuit Court
was reversed with directions to dismiss the bill with costs to
the defendant—Judge Hawley delivering the opinion of the

Circuit Court of Appeals. *Diller* v. *Hawley*, 48 U. S. App. 462. From that decree the plaintiffs have appealed to this court.

As shown by the above statement of the provisions of the act of June 3, 1878, 20 Stat. 89, c. 151, known as the Timber and Stone Act, a purchaser of the surveyed public lands in California, Nevada, Oregon and Washington, valuable chiefly for timber but unfit for cultivation, or valuable chiefly for stone, was required in his sworn application to state that he did not seek to purchase the same on speculation but in good faith to appropriate it to his own exclusive use and benefit, and that he had not, directly or indirectly, made any agreement or contract with any person or persons by which the title he might acquire from the United States should inure in whole or in part to the benefit of any person except himself; and if the applicant swore falsely in the premises, he became liable to the penalties of perjury, and would forfeit the money he paid for the lands; and all right and title to the same and any grant or conveyance he may have made, " except in the hands of *bona fide* purchasers," would be null and void.

Who, within the meaning of the act, are to be deemed *bona fide* purchasers? Could the appellants, against whom, in respect of these lands, no charge of fraud was made, be deemed *bona fide* purchasers, if it appeared to the Land Department, before a patent issued, that the original entryman made the application to purchase " on speculation " and not in good faith to appropriate the lands to his own exclusive use and benefit?

The words " *bona fide* purchasers," as applied to purchasers of public lands, did not appear for the first time in the Timber and Stone Act of 1878. The first section of the act of June 22, 1838, granting preëmption rights to settlers on the public lands, contains substantially the same provisions as to the effect of a false oath by the applicant and the same saving for the benefit of *bona fide* purchasers. 5 Stat. 251, c. 99. Like provisions were made in the act of September 4, 1841, appropriating the proceeds of the sales of the public lands and granting preëmption rights. 5 Stat. 453, 456, c. 16, § 13. And the provisions of the last act were preserved in section 2262 of the Revised Statutes.

The contention of appellants is that as between themselves and the United States they must be deemed to have been *bona fide* purchasers from the moment they bought in good faith from Bailey, the vendee of Hackley, (although no patent had been issued,) and that, under the act, they could not be affected by the fraud of the original entryman or his assignee.

While the mere words of the act of Congress furnish some ground for this contention, the interpretation suggested cannot be approved. In *Root* v. *Shields*, 1 Wool. 340, 348, 363, Mr. Justice Miller had occasion to consider who were to be regarded as *bona fide* purchasers under the preëmption laws when no patent had been issued by the United States. He said: "It is further insisted on behalf of the defendants that they are *bona fide* purchasers, and that they, as such, are entitled to the protection of the court. I think it pretty clear that some at least of these defendants purchased and paid their money without any knowledge in fact of any defect in the title. Yet they are not *bona fide* purchasers, for a valuable consideration, without notice, in the sense in which the terms are employed in courts of equity. And this for several reasons. They all purchased before the issue of the patent. The more meritorious purchased after the entry had been assailed and decided against by the land office. But that is a circumstance not material to this consideration. Until the issue of the patent the legal title remained in the United States. Had his entry been valid, Shields would have taken only an equity. His grantees took only an equity. They did not acquire the legal title. And in order to establish in himself the character of a *bona fide* purchaser, so as to be entitled to the protection of chancery, a party must show that, in his purchase and by the conveyance to him, he acquired the legal title. If he have but an equity, it is overreached by the better equity of his adversary."

The rule thus laid down was followed by Secretary Teller in *Cogswell's Case*, 3 L. D. 23, 28. In *Chrisinger's Case*, 4 L. D. 347, 349, Secretary Lamar said: "It is insisted by counsel, and ably argued at length, that the assignees of Chrisinger, being *bona fide* purchasers after entry, are entitled to intervene and have their interests protected as they took without notice of

any defect in the final proof.   This proposition is not tenable.
It involves the principle that although the claim for title while
in the hands of the entryman is worthless, on account of his
failure to comply with the law, such claim may be strengthened
and made a matter of absolute right by virtue of a transfer to
an innocent purchaser.   The converse of this, however, is true.
Conceding the right of sale after the issuance of final certifi-
cate and prior to patent, the purchaser takes no better claim
for title than the entryman has to confer, and whatever right
is thus acquired is subject to the subsequent action of the Land
Department.   *Myers* v. *Croft*, 13 Wall. 291 ; *Margaret Kissack*,
2 C. L. L. 421.   Again, the Department must deal directly with
its own vendees, with the persons with whom it contracts.   It
cannot undertake to follow the transfers of the grantees, and
to settle questions that may arise upon such transfers, but must
leave such matter for determination in the courts."

So in *Smith* v. *Custer*, 8 L. D. 269, 278, Secretary Vilas said :
" The preëmption purchaser takes by his final proofs and pay-
ment, and his certificate of purchase, only a right to a patent
for the public lands in case the facts shall be found by the Gen-
eral Land Office and the Interior Department upon appeal to
warrant the issuance of it.   Whatever claim to patent he pos-
sesses by virtue of his payment and certificate is dependent
upon the action of the Department and its future finding of
the existence of the conditions, and his compliance in fact with
the prerequisites, prescribed by law to the rightful acquisition
of the public land he claims.   This being so, it is plain that
the purchaser can acquire from the entryman no greater estate
or right than the entryman possesses.   The purchaser is charge-
able with knowledge of the law, which includes knowledge of
this law ; and is chargeable with knowledge of the state of the
title which he buys, in so far, at least, as that the legal title
remains in the United States, subject to the necessary inquiry
and determination by the land office and Department upon which
a patent may issue.   He is not then an ' innocent purchaser,' so
far as there may exist reasons why that patent should not issue.
He buys subject to the risk of the consequences of the inquiry
depending in the Department.   He buys a title *sub judice*.   At

the most, it is but an equitable title, the legal title being in the Government. It is a familiar rule that the purchaser of an equitable title takes and holds it subject to all equities upon it in the hands of the vendor, and has no better standing than he. *Boone* v. *Chiles,* 10 Pet. 177; *Root* v. *Shields,* 1 Woolworth, 340."

These principles were applied by the Land Department in *Travelers' Insurance Co.,* 9 L. D. 316, 320, 321.

Again, in *United States* v. *Allard,* 14 L. D. 392, 405, 406, the question was fully examined by Secretary Noble in the light of the authorities, and his conclusion was thus stated: "A *bona fide* purchaser of land is one who is the purchaser of the legal title, or estate; and a purchaser of a mere equity is not embraced in the definition. *Boone* v. *Chiles,* 10 Pet. 177; 3 Op. Attys. Gen. 664. This was the well-defined meaning of the term long before the enactment of the statute under consideration, and, under a well-established rule of construction, unless it is apparent that Congress intended it to have a different meaning, it is to be presumed to have been used in its technical sense. There is nothing in the present statute to indicate that Congress used the term in other than its technical sense. Indeed, it may properly be considered as having attained a technical meaning as used by Congress in previous legislation relating to the disposal of the public lands. As long ago as 1841, Attorney General Legaré, (3 Op. Attys. Gen. *supra,*) in considering a case which arose under the preëmption act of 1838, 1 Lester, 49, involving the use of the term in that act, and the right of an assignee of a preëmption claimant thereunder, held: 'The assignee took only an equity, and he took it, of course, subject to all prior equities. The patent, it is needless to say, is the only complete legal title under our land laws. But to protect a purchaser under the plea of a purchase for a valuable consideration, without notice, he must have a complete legal title.'" After referring to *Root* v. *Shields,* above cited, the Secretary concluded: "It thus appears that prior to the passage of the act under consideration (June 3, 1878) it had been determined, both by executive construction and judicial interpretation, that the term '*bona fide* purchaser,' as used in the preëmption law, was so used in its technical sense, or with reference to its pre-

viously known and well-defined legal import.   It is therefore
to be presumed, nothing appearing to the contrary, that Con-
gress, in making use of the term in the Timber and Stone Act,
did so in the light of such construction, and must have intended
its·use in the same sense as in the preëmption law, namely, that
to be a *bona fide* purchaser within the protection of the statute,
a party must have acquired by his purchase and the conveyance
to him a complete legal title." See also *Whitaker* v. *So. Pac.
R. R. Co.*, 2 Copp's Public Lands (1882 ed.), 919, 923 ; *Stout* v.
*Hyatt*, 13 Kansas, 232, 243, 244; *Taylor* v. *Weston*, 77 Cali-
fornia, 534, 540.

We are of opinion that the rule announced in *Root* v. *Shields*,
above cited, and which has been steadily followed in the Land
Department, is consistent with the words of the statute.  If any
doubt existed on the subject, the construction so long recognized
by the Interior Department in its administration of the public
lands should be not overthrown, unless a different one is plainly
required—as it is not—by the words of the act.    *United States*
v. *Philbrick*, 120 U. S. 52, 59 ; *United States* v. *Johnston*, 124
U. S. 236, 253 ; *United States* v. *Alabama Great Southern R. R.
Co.*, 142 U. S. 615, 621.

The contention of appellants that they could not be affected
by the fraud, if any, committed by the original entryman or
his vendee being unsound, is there any other ground upon which
the court can hold that the title to these lands is held by the
appellee in trust for them ?

It is contended that the Land Department was without jur-
isdiction to cancel the original entry.   The exclusion of mere
speculators from purchasing the public lands referred to in the
Timber and Stone Act would be of no practical value if it were
true that one having purchased in good faith from an entryman
·who is proved to have sworn falsely in his application, could
demand, of right, that a patent be issued to him.   The Land
Department has authority, at any time before a patent is issued,
to inquire whether the original entry was in conformity with the
act of Congress. *Knight* v. *United States Land Association*, 142
U. S. 161, and *Michigan Land & Lumber Co.* v. *Rust*, 168 U. S.
589, 593, and authorities cited in each case.   Of course, that

Department could not arbitrarily destroy the equitable title acquired ' by the entryman and held by him or his assignee. Those who hold such title have a right to be notified of and heard in any proceeding instituted in the Land Department hav₋ ing for its object the cancellation of the entry upon which the equitable title depends. In the present case the appellants had full notice of the proceedings before the register and receiver and before the Commissioner of the General Land Office, which resulted in the cancellation of the original entry. And we infer from the record that they had notice of the order of the Secretary of the Interior directing the papers to be sent to him for examination. The plea, referring to the action of the Commissioner of the General Land Office and of the Secretary of the Interior, distinctly stated that Hackley " was given every opportunity to be heard before the said officers of the Land Department of the United States, likewise his said transferees, before said certificate was canceled." The allegation in the bill on this point means only that the order of the Secretary of the Interior to send the papers to him was made without notice to Hackley and his transferees. But that is immaterial if they had an opportunity to be heard before the Secretary while the case was in his hands. In the summary of the points relied upon by appellants, it is not claimed that they had no such opportunity. The order of cancellation by the Secretary was based upon the fact, which he ascertained from the evidence, that the original entry of the land in dispute was not in good faith for the exclusive benefit and use of the entryman but for the speculative purposes of others with whom the entryman was in collusion.

It is suggested that the order of the Land Department cancelling the entry was based upon a misconstruction of the law. If it had been, then the error committed could be corrected by the courts; for, as said in *Sanford* v. *Sanford*, 139 U. S. 642, 647, where the matters determined by the Land Office " are not properly before the Department, or its conclusions have been reached from a misconstruction by its officers of the law applicable to the cases before it, and it has thus denied to parties rights which, upon a correct construction, would have been con-

ceded to them, or where misrepresentations and fraud have been practiced, necessarily affecting its judgment, then the courts can, in a proper proceeding, interfere and control its determination so as to secure the just rights of parties injuriously affected." See also *Quinby* v. *Conlan*, 104 U. S. 420, 426; *Baldwin* v. *Stark*, 107 U. S. 463, 465; *Cornelius* v. *Kessel*, 128 U. S. 456, 461. But there was no misconstruction of the law by the Land Department. Upon the facts found, no other conclusion could properly be reached than the one indicated by the opinion of the Secretary of the Interior, *United States* v. *Bailey*, 17 L. D. 468, namely, that the original entry of the land was in violation of the act of Congress.

We are of opinion that the result of the decisions of this court was correctly stated by Judge Hawley, when speaking for the United States Circuit Court of Appeals, in *American Mortgage Co.* v. *Hopper*, 29 U. S. App. 12, 17, he said: "(1) That the Land Department of the Government has the power and authority to cancel and annul an entry of public land when its officers are convinced, upon a proper showing, that the same was fraudulently made; (2) that an entryman upon the public lands only secures a vested interest in the land when he has lawfully entered upon and applied for the same, and in all respects complied with the requirements of the law; (3) that the Land Department has control over the disposition of the public lands until a patent has been issued therefor and accepted by the patentee; and (4) that redress can always be had in the courts where the officers of the Land Department have withheld from a preëmptioner his rights, where they have misconstrued the law, or where any fraud or deception has been practiced which affected their judgment and decision."

One other question remains to be considered. The appellants insist that the order of the Secretary of the Interior cancelling the entry of these lands could be of no legal effect without being approved by the Attorney General. This question is one of no little importance in the administration of the public lands. It has never been directly determined by this court.

The sections of the Revised Statutes upon the construction of which this question depends are the following: "§ 2450. The

Commissioner of the General Land Office is authorized to decide upon principles of equity and justice, as recognized in the courts of equity, and in accordance with regulations to be settled by the Secretary of the [*Treasury*,] [Interior] the Attorney General, and the Commissioner, conjointly, consistently with such principles, all cases of suspended entries of public lands and of suspended preëmption land claims, and to adjudge in what cases patents shall issue upon the same. § 2451. Every such adjudication shall be approved by the Secretary of the [*Treasury*] [Interior] and the Attorney General, acting as a board; and shall operate only to divest the United States of the title of the lands embraced thereby, without prejudice to the rights of conflicting claimants. § 2452. The Commissioner is directed to report to Congress at the first session after any such adjudications have been made a list of the same under the classes prescribed by law, with a statement of the principles upon which each class was determined. § 2453. The Commissioner shall arrange his decisions into two classes, the first class to embrace all such cases of equity as may be finally confirmed by the board, and the second class to embrace all such cases as the board reject and decide to be invalid. § 2454. For all lands covered by claims which are placed in the first class, patents shall issue to the claimants; and all the lands embraced by claims placed in the second class shall, *ipso facto*, revert to, and become part of, the public domain. § 2455. It may be lawful for the Commissioner of the General Land Office to order into market, after due notice, without the formality and expense of a proclamation of the President, all lands of the second class, though theretofore unproclaimed and unoffered, and such other isolated or disconnected tracts or parcels of unoffered lands which, in his judgment, it would be proper to expose to sale in like manner. But public notice of at least thirty days shall be given by the land officers of the district in which such lands may be situated, pursuant to the directions of the Commissioner. § 2456. Where patents have been already issued on entries which are confirmed by the officers who are constituted the board of adjudication, the Commissioner of the General Land Office, upon the cancelling of the outstanding patent, is authorized to issue a new pat-

ent, on such confirmation, to the person who made the entry, his heirs or assigns. § 2457. The preceding provisions, from section 2450 to section 2456, inclusive, shall be applicable to all cases of suspended entries and locations, which have arisen in the General Land Office since the twenty-sixth day of June, 1856, as well as to all cases of a similar kind which may hereafter occur, embracing as well locations under bounty-land warrants as ordinary entries or sales, including homestead entries and preëmption locations or cases; where the law has been substantially complied with, and the error or informality arose from ignorance, accident or mistake which is satisfactorily explained; and where the rights of no other claimant or preemptor are prejudiced, or where there is no adverse claim."

Judge Hanford in the Circuit Court held, as we have seen, that the case in the Land Department after the entry had been suspended should have been adjudicated by the board, composed of the Attorney General, the Secretary of the Interior and the Commissioner of the General Land Office, as provided by sections 2450 and 2451, and that the Secretary of the Interior, without a determination of that board, could not lawfully cancel the entry — citing *Stimson Land Co.* v. *Hollister*, 75 Fed. Rep. 941. The Circuit Court of Appeals said upon this point: "In the numerous decisions of the Supreme Court sustaining the authority of the Commissioner of the General Land Office and of the Secretary of the Interior to affirm, modify or annul the entries of public land made in the local land offices, no reference is made to the provisions of sections 2450 and 2451. Notwithstanding this fact, we are asked to assume that that court must have overlooked these provisions of the statute. We decline to act upon any such presumption."

The legislation embraced in the above sections is the outgrowth of the acts of August 26, 1842, 5 Stat. 534, c. 205; August 3, 1846, 9 Stat. 51, c. 78; July 17, 1848, 9 Stat. 246, c. 101; March 3, 1853, 10 Stat. 258, c. 152, and June 26, 1856, 11 Stat. 22, c. 47. Sections 2450 to 2455, both inclusive, were taken from the act of August 3, 1846, which was confined to " cases of suspended entries *now* existing in said land office;" and the operation of the act was limited to a period of two

years, but its operation was extended to August 3, 1849, by the act of July 17, 1848 and by the act of March 3, 1853, was extended for a term of ten years from March 3, 1853, and made applicable "as well to cases which were inadvertently omitted to be acted on under said act as to those of a like character and description which have arisen between the date of said act and the present time." And the act of June 26, 1856, revived and continued in force the provisions of the acts of August 3, 1846, and March 3, 1853, as to all cases of suspended entries and locations "where the law has been substantially complied with and the error or informality has arisen from ignorance, accident or mistake, and is satisfactorily explained, and where the rights of no other claimant or preëmptor will be prejudiced, or where there is no adverse claim."

The act of June 26, 1856, is reproduced in the Revised Statutes as section 2457.

Thus after June 26, 1856, the statutes relating to the board were not applicable to every case of suspended entry, but to those specially mentioned in the act of that date. As carried into the Revised Statutes the purpose of this legislation is, where the law has been substantially complied with, to authorize the confirmation of entries which otherwise the land officers would be compelled to reject because of errors or informalities which, if satisfactorily explained as arising from ignorance, accident or mistake, would, in the absence of an adverse claim, be excused by the courts, in administering the principles of equity and justice. The purpose of the legislation was not to limit or restrict the general or ordinary jurisdiction of the land officers. It was rather to supplement that jurisdiction by authorizing them to apply the principles of equity, for the purpose of saving from rejection and cancellation a class of entries deemed meritorious by Congress, but which could not be sustained and carried to patent under existing land laws. There was no necessity for legislation authorizing the rejection or cancellation of irregular entries, but legislation was necessary to save such entries from rejection and cancellation when otherwise meritorious.

Primarily the decision and adjudication of suspended entries

is, under sections 2450 and 2451, as theretofore, left with the Commissioner of the General Land Office, except that he is to be guided by the principles of equity and justice, and by the regulations settled by the Secretary of the Interior, the Attorney General and the Commissioner, conjointly. The only question is whether all decisions of the Commissioner upon such suspended entries must be submitted to the Secretary of the Interior and the Attorney General, acting as a board, for approval.

If the matter rested upon section 2450 and the first part of section 2451, it might well be contended that a decision rejecting or cancelling a suspended entry should, equally with a decision sustaining such an entry, be submitted to the board for approval. But the latter part of section 2451 does not sustain that view. It is there declared that "every such adjudication," if approved by the board, "shall operate only to divest the United States of the title of the lands embraced thereby." A decision merely rejecting or cancelling the entry could not, with or without the approval of the board, have the effect of divesting the United States of its title. That effect could only flow from a decision sustaining the entry, and since the effect of a decision by the Commissioner such as is required to be submitted to the board and of an approval thereof by the board, is to divest the United States of its title, it follows that only decisions sustaining irregular entries are required to be submitted to the board for its approval. Decisions rejecting or cancelling such entries have the force and effect otherwise accorded to them by the general land laws, and are subject to the appellate or supervisory authority of the Secretary of the Interior as in other instances.

The reasons for requiring the approval by the Secretary of the Interior and the Attorney General of decisions of the Commissioner sustaining irregular entries, under this exceptional legislation, do not apply to decisions rejecting and cancelling such entries. In the one instance claims to public lands are sustained, although acquired in an irregular manner, while in the other such claims are rejected and the public title preserved.

Hackley's entry of the lands in controversy was not suspended because of any error or informality therein arising from igno-

rance, accident or mistake susceptible of explanation, but because of the charge that the same was unlawfully and speculatively made for the benefit of others and not for his own exclusive use and benefit. The suspension was ordered with a view to an investigation and hearing upon that charge. The decision of the Commissioner sustaining the entry, following this investigation and hearing, was not therefore rendered in pursuance of the special authority conferred upon him by sections 2450 to 2457 of the Revised Statutes, but under the general authority given to him, in respect of the public lands, by sections 441, 453 and 2478 of the Revised Statutes and by the act of June 3, 1878, under which Hackley's entry was made.

We are of opinion that the Commissioner's decision having been made under his general authority, and not under the exceptional authority given by sections 2450 to 2457, was not required to be submitted to the Secretary of the Interior and the Attorney General, acting as a board, for approval, but was subject to the appellate or supervisory authority of the Secretary of the Interior under sections 441, 453 and 2478 of the Revised Statutes. *Knight* v. *United States Land Association,* 142 U. S. 161, 177. It follows that the Secretary of the Interior in reversing the decision of the Commissioner of the General Land Office and in rejecting and cancelling Hackley's entry did not exceed the jurisdiction conferred upon him by law.

The matter determined by the decision of the Secretary was whether Hackley's entry was made in good faith for his own exclusive use and benefit. After notice, investigation and hearing, the Secretary of the Interior determined that question against Hackley. In the absence of a charge that this decision was fraudulently given or obtained—and no such charge is made—the Secretary's determination of this question of fact is conclusive upon the courts. This is established by repeated decisions. And if the charge against Hackley's entry be considered as one of fraud, involving a mixed question of fact and law, still the decision of the Secretary of the Interior cancelling that entry fully states the evidence or facts from which the fraud was held by him to be deducible as a matter of law. Upon an examination of that decision and of the evidence or facts there-

in recited we are not prepared to hold that any error of law was committed by that officer.

This disposes of all the questions in the case that need be noticed, and the decree below is

*Affirmed.*