294 P.2d 385

**Bertha SCHELL, Appellant,**

v.

**Robert L. WHITE and Betty White, his wife, Appellees.**

No. 5815.

Supreme Court of Arizona.

Feb. 28, 1956.

Clark & Coker, Phoenix, for appellant.

Head & Palmer, Prescott, for appellees.

LA PRADE, Chief Justice.

Pursuant to Section 11–312, A.C.A.1939, plaintiff-appellant, on September 6, 1950 petitioned the State Land Department to bring an action in the Superior Court to have appellees' state grazing lease cancelled on the ground that said lease had been "obtained through fraud and deceit or concealment of facts". After a hearing before the State Land Commissioner, in which both sides were represented, the Commissioner denied appellant's petition. From this decision plaintiff-appellant appealed to the Superior Court of Yavapai County where, under Section 11–210, 1952 Cum.Supp., A.C.A.1939, the court tried the case de novo, made independent findings of fact and conclusions of law, and affirmed the decision of the Land Commissioner. This is an appeal from the judgment of the Superior Court.

The essential facts are as follows: In 1941, appellant, Mrs. Schell, obtained a grazing lease of various federal properties,

including the E½E½ of Section 35, T16½N, R9W, from the United States Government for a period of five years under the provisions of the Taylor Grazing Act, 43 U.S.C.A. § 315 et seq. During the following year appellees' predecessor in interest, one Wooten, requested the State of Arizona to apply to the federal government for an exchange of lands, pursuant to Section 8 of the Taylor Grazing Act, supra. The State of Arizona approved this request by Wooten, and on June 10, 1942 filed its application with the United States General Land Office for an exchange of lands, including the aforementioned E½E½. In July, 1942 Wooten filed a formal written application under oath with the Arizona State Land Department to lease the E½ of Section 35. In this application Wooten stated that there were no occupants or improvements on the land, and claimed superior rights to that portion of the range, whereas in truth and fact Mrs. Schell was in possession under her grazing lease and also had a valid unpatented mining claim partially extending into the E½E½. Within the same month he received a five-year lease of lands which included the E½E½, since it was the practice of the State Land Department at that time to immediately lease any lands which had been applied for under the Taylor Grazing Act, even though patents had not issued. In 1947, Wooten made application to renew his lease and again failed to disclose the true facts. This time his lease was renewed for ten years. Appellant's lease of the land in question from the United States expired in 1946, prior to which time she applied for renewal. Her lease of federal lands was renewed, but the E½E½ was not included therein. Appellant's application for leasing the E½E½ was not rejected; it was merely suspended, in accordance with Section 147.19, Code of Federal Regulations, Title 43, 1940 Ed., pending final action by the Bureau of Land Management (formerly the General Land Office), on the State of Arizona's exchange application for said lands.

In August, 1949 Wooten, with the approval of the State Land Commissioner, assigned his state grazing lease, which included the lands in question, to Robert L. and Betty White and C. M. and Helen Floyd. On June 1, 1950 the said Floyds, with the approval of the Commissioner, assigned all of their interest in said lease to the Whites, the appellees herein.

On March 13, 1950, approximately eight years after the state had applied therefor, the United States approved the state's application for an exchange of lands and on May 4, 1950 issued a patent to said lands, including the E½E½. Subsequently, on May 24, 1950 the federal government notified Mrs. Schell of the issuance by it of a patent to the lands in question to the State of Arizona and thereupon rejected her application for a lease of the E½E½, action on which had been suspended in 1947. Within four months from receiving the above notification Mrs. Schell petitioned

the State Land Commissioner to bring an action to cancel appellees' lease of the E½E½ of Section 35 on the grounds of fraud.

Upon denial of her petition by the State Land Commissioner she appealed to the Superior Court of Yavapai County, which held her guilty of laches and stale demand, and that she was estopped to seek the relief prayed for since appellees were bona fide purchasers for value and "any misrepresentation or fraud on the part" of Wooten, the original applicant, was not chargeable to appellees.

Appellant presents many assignments of error on this appeal, but we believe that the disposition of this case depends primarily on the following questions: (1) What were the rights of the State of Arizona as to the land for which it had made application to the United States Government under the exchange provisions of the Taylor Grazing Act before patent issued on May 4, 1950? (2) Did Wooten misrepresent the facts in his original application and renewal application for a state grazing lease to the State Land Department and, if so, were these misrepresentations instrumental in his procurement of said lease? and (3) Were appellees bona fide purchasers for value of the lease originally granted to Wooten, and renewed in 1947 by the State of Arizona?

### What right did the State have in lands prior to patent?

In 1940, in the opinion of the General Land Office, which, at the time had jurisdiction over federal public lands, the State of Arizona had no rights to the exchange lands until patent issued. In February of that year the federal agency declared in a letter that Arizona should not issue leases for lands applied for under the Taylor Grazing Act until patents for the lands had been issued to it by the United States. Subsequent to this letter the Arizona Land Commissioner wrote to the General Land Office, asking that agency to reconsider its February pronouncement. On July 23, 1940, Mr. E. K. Burlew, Acting Secretary of the Interior, wrote a letter to the State Land Commissioner in reply to the latter's request for reconsideration of the question. Mr. Burlew quoted directly from the Taylor Grazing Act and examined cases cited by the Land Commissioner and concluded: "It is apparent that a state cannot lawfully lease and collect rent for land to which it has no legal or equitable title." This conclusion is amply supported by the cases. A patent is an instrument by which the United States conveys title to public lands. McCarty v. Helbling, 1914, 73 Or. 356, 144 P. 499. Until the patent issues the fee of the land is in the United States. Baker v. Berg, 1917, 138 Minn. 109, 164 N.W. 588, certiorari denied 1918, 246 U.S. 661, 38 S.Ct. 332, 62 L.Ed. 927; Bovey-Shute Lumber Co. v. Erickson, 1918, 41 N.D. 365, 170 N.W. 628.

From the above statements of the law concerning the issuance of land patents by the United States to public lands it is

indisputable that title to the lands sought by the State of Arizona from the federal government in 1942 was not conveyed to Arizona until the patent issued on May 4, 1950. Prior to that date the United States owned said lands in fee simple; after that date the fee was in the State of Arizona. As a result, prior to May 4, 1950 Arizona had no legal right, authority or power to grant a lease to the E½E½ (land in question) to anyone, and any attempts to do so were null and void. Consequently, as a matter of law, Wooten obtained nothing from the State of Arizona in either 1942 or 1947. During the entire period before his assignment of the purported lease in 1949 to the Whites and the Floyds, Wooten had no legal rights to the land in question, except perhaps a bare expectancy that his application made to the State Land Department in 1942, and renewed in 1947, would be favorably acted upon when said department got jurisdiction over the land. Therefore, when Wooten assigned his "lease" in 1949 to the Whites and the Floyds, all he was actually doing from a legal standpoint was assigning all his rights in his renewed application to said parties. Appellees herein and their co-grantees, the Floyds, received nothing more from Wooten since that was all he owned. It is probable that neither Wooten, the Whites, the Floyds, nor even perhaps the State Land Commissioner realized that under the law Wooten had nothing to assign except a mere expectancy, but this ignorance of the law could not affect the rights of third parties.

Appellees contend that even if it be admitted that the State of Arizona had no legal authority to grant Wooten a lease before patent issued, the acquisition of good title by the State validated previous acts by the Land Department, with the result that the after-acquired title inured to the benefit of Wooten's assignees as of May 4, 1950. Assuming without deciding that this is so we do not believe that it can have any bearing on the outcome of this decision for the reason that the Whites were not bona fide purchasers for value, as will be more specifically pointed out.

 Prior to May 4, 1950 Mrs. Schell depended on the legal premise that jurisdiction over these lands remained in the federal government and as a result she did not take any action with the State Land Department until this department acquired jurisdiction to act. This did not occur until May 4, 1950. Consequently, the lower court was in error when it held that appellant was barred by laches and stale demand for not contesting Wooten's application prior to 1950. A party is not required to present his case before a governmental agency which has no jurisdiction over the subject matter in dispute, and failure to do so does not constitute laches, stale demand or estoppel.

### Did Wooten misrepresent material facts in his applications?

Appellant charged in her petition to the Land Department that Wooten, the original applicant, had fraudulently misrepresented

material facts in his two applications to the Land Department and that, relying on these misrepresentations, the Department had granted him a "lease" in 1942 and renewed it in 1947. Initially it is worthy of note that although the Land Commissioner stated in his opinion denying appellant's petition that "some of the statements made by W. J. Wooten in his application for selection and for lease made on the 12th day of June, 1942, and in his application for renewal of lease made on the 20th day of May, 1947, are now found not to have been in all respects the true facts", the Superior Court made no finding in this regard, since it did not consider such facts to be material to its decision. This failure to find as a fact misrepresentation and/or fraud on the part of Wooten has been assigned as error by appellant. The record shows that in Wooten's first application for a state grazing lease in 1942, the following questions were answered under oath as indicated:

"Q. Are there any squatters, settlers or other occupants upon this land or any part of it? A. No.

"Q. Are there any improvements on the land? A. No.

"Q. Do you claim superior right to lease this tract by virtue of other land holdings, water rights, or other equities in the vicinity of same? A. Yes.

"Q. Give particulars. A. This is in my range and is very necessary to proper management of my range."

At the time Wooten made this application the uncontroverted evidence shows that the appellant had been in possession of the subject land for well over a year under a valid grazing lease from the United States; that improvements in the form of trails and "some fencing" were on the land; and that Mrs. Schell possessed a state grazing lease of land contiguous to the east side of the E½E½ of Section 35, as well as a federal grazing lease of land contiguous to the west boundary line of the subject land.

In Wooten's renewal application submitted in 1947, he again swore that there were no squatters, settlers or occupants upon the land; claimed superior rights as before; and alleged in substance that the only improvements on the land had been placed there by him. As of this date appellant was still in possession of the land and had applied to the federal government for a renewal of her grazing lease. In addition, both in 1942 and 1947, appellant had an unpatented mining claim on a small segment of the subject land.

The State Land Commissioner who had been in office from 1941 to 1948 testified, after having examined appellant's exhibit No. 1 showing the lands under federal and state leases to appellant in 1942, it was "quite doubtful" that Wooten would have been granted a lease to the E½E½ if the Department had been aware of the pattern of appellant's holdings. The Commissioner also testified that the Department had not known that Mrs. Schell had an ex-

isting grazing lease from the federal government at that time; that it was not the policy of the Department to issue leases to applicants when the land was already under federal lease; that had the truth been known Mrs. Schell would have had the opportunity to contest Wooten's application; and, finally, that the Department relied upon Wooten's sworn statements in issuing him a lease. None of this testimony was contradicted in any way by appellees.

Appellant's exhibit No. 5 sets forth the rules and regulations adopted by the Land Department on July 1, 1943 governing grazing leases. According to the Commissioner, the policy of the Department as indicated by these regulations was the same as that in effect in June, 1942. These regulations explicitly state that where grazing leases under Section 15 of the Taylor Grazing Act, 43 U.S.C.A. § 315m, supra, are concerned priority will be given by the State Land Department to holders of such leases. In addition the Department's policy is and was, at all times material to the circumstances of this case, not to break up "previously established" grazing units "except in such rare cases as it is shown that there are clear equities in favor of the applicant", in which cases the burden of proof is placed upon the party desiring to change the ownership of the lease.

■ In view of the above facts, all uncontroverted, we believe that the trial court erred in failing to make a finding of fact to the effect that Wooten's leases were pro-

cured by fraud and misrepresentation of material facts. In the light of Section 11–301(b), 1952 Cum.Supp., A.C.A.1939, which reads in part as follows:

"No lease will be granted under this section without application therefor. All applications for lease shall be made upon forms prepared and furnished by the commissioner and shall be signed and sworn to by the applicant or his authorized agent or attorney, and filed with the commissioner.

\* \* \* \* \* \*

"Any material false statement or concealment of facts made by any applicant, his authorized agent or attorney, in his application to lease, which statement, if known to the department would have prevented its issue in the form or to the person issued, shall be grounds for cancelation of any lease issued upon such application."

we believe that, absent other valid defenses, the trial court would have been obliged to cancel appellees' lease. We next turn to the main defense of appellees.

Were appellees bona fide purchasers?

■ The next question concerns the status of appellees at the time they, together with the Floyds, purchased Wooten's "lease". Were they bona fide purchasers for value of Wooten's "lease", thereby cutting off or avoiding any infirmities of title which may have been held against Wooten and been ground for cancellation

of his "lease" by the State of Arizona as a result of his allegedly fraudulent statements in his applications? The facts in this case are somewhat analogous to the situation where a person purchases public lands from one who has applied to the federal government for a patent thereto, *prior* to issuance of the patent. In such cases it has generally been held that a purchaser in good faith and for value of the right, title and interest of a holder of a certificate of purchase from the General Land Office *before* patent issued, is not a bona fide purchaser but on the contrary is subject to the same infirmities of title as the original entryman. The fraud of the original applicant for a patent prevents good title from vesting in subsequent purchasers who have derived their title from him. American Mortgage Co. of Scotland, Ltd., v. Hopper, 9 Cir., 1894, 64 F. 553; Parsons v. Venzke, 1894, 4 N.D. 452, 61 N.W. 1036, affirmed, 1896, 164 U.S. 89, 17 S.Ct. 27, 41 L.Ed. 360; California Redwood Co. v. Little, C.C. N.D.Cal.1897, 79 F. 854, affirmed, 1900, 179 U.S. 681, 21 S.Ct. 919, 45 L.Ed. 384; Peyton v. Desmond, 8 Cir., 1904, 129 F. 1; United States v. Laam, C.C.N.D.Cal.1906, 149 F. 581; Moses v. Long-Bell Lumber Co., 5 Cir., 1913, 206 F. 51, appeal dismissed (for lack of jurisdiction) 1915, 239 U.S. 625, 36 S.Ct. 162, 60 L.Ed. 473.

In Moses v. Long-Bell Lumber Co., supra, [206 F. 55] the facts were as follows: the plaintiff, Long-Bell Lumber Co., purchased all the timber on land which had been homesteaded by one Susie Wellborn, who had received a final certificate from the General Land Office, although no patent had as yet issued. Over a year later the General Land Office learned that Susie Wellborn had never resided on the land as required by law and, subsequently, her entry and final certificate were cancelled and another person (Moses) was allowed to enter the land. Upon Moses' refusal to allow plaintiff to enter and cut timber the company sued. The lower court overruled defendant's demurrer and defendant appealed. The Circuit Court reversed the trial court and in denying plaintiff's contention that it was a bona fide purchaser stated:

"We cannot see how the plaintiff, as the vendee of Susie L. Wellborn, can have any better title than she had. It must be remembered that throughout these transactions the government had, and now has, the legal title to the land as matter of law, and that the plaintiff, purchasing from one who holds, not a patent, but a final certificate, was chargeable with notice that the legal title was in the government, and that the certificate, for cause, was subject to cancellation.

\* \* \* \* \* \*

" \* \* \* The holder of the final certificate had a claim prima facie entitling her to title, but subject to cancellation by the government for cause. She sells the timber on the land to one charged with notice of the character

164

of her claim. The certificate is canceled. The buyer, we think, has no claim on the timber, because he has no better title than his vendor. He has no claim on the government or its subsequent patentee. * * * It is decided in Hawley v. Diller, 178 U.S. 476, 20 S.Ct. 986, 44 L.Ed. 1157, that an entryman holding a final certificate acquires only an equity, and that a purchaser from him, the entry being subsequently canceled, cannot be regarded as a bona fide purchaser. * * *"

Again, in Peyton v. Desmond, supra, [129 F. 9] the court in arriving at a similar decision to that in the Long-Bell Lumber case stated:

" * * * One who purchases of an entryman before the issuance of a patent obtains no greater right or estate than is possessed by the entryman, and acquires at the most a right or equitable estate, which is subject to examination in the Land Department while the title remains in the government. In the absence of a statute providing otherwise, he is chargeable with knowledge of the state of the title which he buys, holds it subject to any equities which could be asserted against it in the hands of the vendor, and takes the risk of losing it if it is subsequently shown that the entry is based upon an error of law or a clear misapprehension of the facts, which, if not corrected, will lead to the transfer of the government's title to one not entitled to it. * * *"

We believe that the reasoning in the above cases is applicable to the case at bar. Although appellees did not know of Wooten's misrepresentations of fact in his applications, they were not bona fide purchasers for value, but, on the contrary, merely obtained the same rights as Wooten had and necessarily were subject to any infirmities of title and any misrepresentation or fraud which could have been asserted against Wooten by the State of Arizona. Any other rule would open the door to fraud since an applicant for a privilege from the state could very well submit an application containing material misrepresentations of fact to the State, and before the State had acted upon it (or as here before the State had authority to act upon it), assign it to a third party, who was innocent of the misrepresentations, for value. An application must speak as of the date it is to be acted upon or the date upon which jurisdiction to act upon it is acquired. Since appellees were not bona fide purchasers for value of Wooten's "lease" in 1949, when the original assignment occurred, obviously they cannot be held to be bona fide purchasers for value of the other half of the actual lease assigned to them by their co-owners, the Floyds, on June 1, 1950. Consequently, the appellees stand in the same shoes as Wooten would have, had he never made the assignment. It is not open to argument that if Wooten himself had received a lease from the State of Arizona

after May 4, 1950, that the appellants herein would have the right to attack said lease on the grounds of fraud or material misrepresentation.

The procedure to be followed in seeking cancellation of a state lease is set out in Section 11–312, A.C.A.1939, which reads:

"Before any action may be brought for the cancelation of a lease the land department shall hold a public hearing after due notice thereof to the lessee or assignee. The department may then order the commissioner to bring an action to cancel said lease and if it appear that such lease was procured through fraud, deceit or wilful misrepresentation, the court *shall* cancel said lease and forfeit the improvements on the land to the state; but should said lease be canceled for any other reason, then the lessee shall be permitted to remove his improvements at any time within sixty (60) days." (Emphasis supplied.)

Mrs. Schell's petition to the Land Department, pursuant to the above statute, was denied and she promptly appealed to the Superior Court of Yavapai County in accordance with the provisions of Section 11–210, 1952 Cum.Supp., A.C.A.1939. The Superior Court tried the case de novo, made independent findings of fact and conclusions of law, and affirmed the decision of the State Land Commissioner.

The question necessarily arises as to the proper procedure to be followed in those cases where the Superior Court, after a trial de novo, disagrees with the Land Commissioner's determination and does find fraud or misrepresentation on the part of the lessee or assignee. Is the Superior Court, in reversing the Commissioner, required to send the case back to him and order him to bring a new action to cancel the lease, or does the court have the power to cancel the lease without further proceedings? We believe that the language of Section 11–210, 1952 Cum.Supp., A.C.A. 1939, requiring the Superior Court to try the case de novo, "make independent findings of fact and conclusions of law from the evidence submitted", contemplates a trial of the issues as if they had originated in the Superior Court and not in the Land Department.

In view of the foregoing, and since we do not believe that reasonable men could differ as to the facts indicating misrepresentations of fact on Wooten's part in his two applications, Mrs. Schell's prior possession, and the uncontroverted testimony of the Land Commissioner as to the policies of the Land Department in giving priority to existing lessees under the Taylor Grazing Act and not breaking up established grazing units, we hereby reverse the judgment of the trial court and direct it to enter judgment canceling the lease of the appellees as to the E½E½ of Section 35, T16½N, R9W.

UDALL, WINDES, PHELPS and STRUCKMEYER, JJ., concur.