# UNITED STATES *v.* DETROIT TIMBER AND LUMBER COMPANY.

# MARTIN–ALEXANDER LUMBER COMPANY *v.* UNITED STATES.

## APPEAL AND CROSS APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 106, 165. Argued December 7, 1905.—Decided February 19, 1906.

The rule of law concerning good faith is the same in respect to purchases of land and timber as that which obtains in other commercial transactions, and no one is bound to assume that the party with whom he deals is a wrongdoer; but, on paying full value for the property presented, the title to which is apparently valid and in regard to which there are no suspicious circumstances, he will acquire the rights of a *bona fide* purchaser.

Equity looks at the substance and not at the mere form in which a transaction takes place, and constructive fraud in the entries of land pur-

chased by one company from another will not be charged to the purchaser where there is nothing which casts imputation on its conduct, or tends to show that it was not a purchaser in good faith, because after the actual purchase and payment therefor, but prior to the final conveyance, an officer of the vendee company became an officer of the vendor company for the purpose of closing up its business.

Although the doctrine of relation is but a fiction of law it is resorted to whenever justice requires, and under it patents for lands when issued by the United States become operative as of the dates of the entries,— the inception of the equitable right upon which the patent is based— and the doctrine can be applied to protect a bona fide purchaser of timber notwithstanding the wrongful character of the entries of which he is ignorant. But the doctrine of relation never carries a patent back to the date of any entry other than that on which it is issued.

The headnotes to the opinions of this court are not the work of the court but are simply the work of the Reporter, giving his understanding of the decision, prepared for the convenience of the profession.

A final receipt is an acknowledgment by the Government that it has received full pay for the land and holds the title in trust for the entryman and will in due course issue to him a patent, and thereupon he becomes the equitable owner of the land.

Until the patent which passes the legal title is issued the legal title remains in the Government and is subject to investigation and determination by the Land Department, but this power will not be exercised arbitrarily or without notice, and if improperly exercised the rights of the entryman may be enforced in the courts after the patent has been issued to other parties.

The principles of equity exist independently of, and anterior to, all Congressional legislation, and the statutes are either annunciations of those principles or their applications to particular cases, and a party dealing with an entryman the evidences of whose entry are in form good and sufficient is justly entitled to the consideration of a court of equity, and one who has in good faith cut and removed timber under contract with such an entryman whose entry is subsequently cancelled and purchase money retained by the Government, cannot be compelled to account to the Government for the timber cut and removed in reliance on such contract.

THESE are cross appeals from a decree of the Circuit Court of Appeals for the Eighth Circuit, affirming in part and reversing in part a decree of the Circuit Court for the Western District of Arkansas.

The bill was filed on April 5, 1902, by the United States against the Detroit Timber and Lumber Company, the Martin-

Alexander Lumber Company and a number of individual defendants. The object of the bill was to set aside patents to forty-four tracts of land issued to the individual defendants and all conveyances, contracts and leases from them purporting to convey title to or a right to cut and remove timber from the lands, and also for an accounting of the timber cut and removed from the lands by the two companies, and judgment therefor.

The charge was that the lands were entered under the timber act of June 3, 1878, 20 Stat. 89, and in fraud of its provisions, in that the purchase money was advanced by the Martin-Alexander Company under contracts with the entrymen that after the entries they should convey to it all the standing timber thereon. The Martin-Alexander Company denied that there were any such contracts, and the Detroit Company in addition pleaded that it was a *bona fide* purchaser from the former company. It appeared from the testimony that for some time prior to January 14, 1901, the Martin-Alexander Company owned and operated a sawmill plant in the vicinity of these lands; that most, if not all, of the entrymen were its employés; that it furnished all the money for the purchase prices of these lands as well as for the expenses connected with the entries, and that after the entries the entrymen, with three exceptions, executed conveyances to it of all the standing timber. Fifty-eight and one-half per cent of the stock of the Martin-Alexander Company belonged to E. B. Martin, while A. V. Alexander controlled the remainder, which was owned by himself, his wife, and J. O. Means.

On January 14, 1901, the Detroit Company purchased the entire property of the Martin-Alexander Company for $60,000 cash and an assumption of its obligations, amounting to $17,456.79. Prior to May 9, 1901, patents were issued for all the lands, thirteen having been issued before January 14, 1901. After the purchase from the Martin-Alexander Company the Detroit Company obtained deeds of the lands from the patentees of twenty-seven of the tracts.

The Circuit Court found that the transactions between the entrymen and the Martin-Alexander Company were not in conflict with the statute, that there were no agreements between them and it prior to the entries in respect to conveyances of the standing timber, and that there was only the mere expectation on the part of the company that it would be able to purchase the timber. Thereupon it dismissed the bill. 124 Fed. Rep. 393. The Court of Appeals, reviewing the testimony, held that there were contracts between the parties making the entries and the Martin-Alexander Company prior to the entries, and that therefore those entries were in fraud of the act, but it also found that the purchase by the Detroit Company was in good faith, and that therefore that company was entitled to protection in its purchase. It ordered the bill dismissed as to the twenty-seven tracts for which patents had been issued and conveyances made to the Detroit Company. As to the seventeen which had not been conveyed, it ordered a decree cancelling the patents, but dismissing the bill so far as respects any relief claimed against the Detroit Company. 67 C. C. A. 1.

*Mr. Marsden C. Burch* and *Mr. Fred A. Maynard,* Special Assistants to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States:

This case is the same in principle and fact as *United States* v. *Trinidad Coal & Coke Co.,* 137 U. S. 160, 166, and is not controlled by *United States* v. *Budd,* 144 U. S. 154. In the latter case there was but one entry; in the case at bar there was a gigantic conspiracy to gather in an immense tract of land through a premeditated scheme. The testimony bears this out.

The Detroit Company had actual notice. Clark & Marshall on Private Corporations, §§ 348, 354, and cases cited; 2 Morawetz on Corp., 2d ed., p. 943.

The so-called purchase by the Detroit Company was merely a merger, although appellees claim that the transaction cannot

be regarded as a merger for the reason that they had not the legislative authority to bring about a merger; but as to this proposition no corporation can defend its acts or change their character in law by the claim that such acts are *ultra vires;* and legislative authority is not necessarily a condition precedent to a legal merger. Such a merger may always be ratified by the legislature after it has taken place. *Bishop* v. *Brainerd,* 28 Connecticut, 289; *Mead* v. *New York &c. R. Co.,* 45 Connecticut, 199.

The Detroit Company also had constructive notice. It was put on notice as to all the circumstances of the case.

The appellees contend that their duty stopped with the mere assurance from the vendor that the title was all right. They knew that the company had no record title to the lands described. They had no legal right to rely upon the bare statement of interested parties whose interest might prompt them to make false or misleading statements. *Price* v. *MacDonald,* 54 Am. Dec. 657.

Passive good faith will not serve to excuse willful ignorance. 2 Pomeroy on Eq. Jur. § 762; 21 Am. & Eng. Ency. of Law, 584, and 23 Am. & Eng. Ency. of Law, 515, and authorities cited, and see also *Hawley* v. *Diller,* 178 U. S. 476, which holds that one cannot be a *bona fide* purchaser who does not make a searching inquiry as to the property acquired.

*Mr. James F. Read,* with whom *Mr. U. M. Rose, Mr. Thomas C. McRae* and *Mr. George B. Rose* were on the brief, for appellees in No. 106.

*Mr. W. E. Hemingway,* with whom *Mr. U. M. Rose* and *Mr. George B. Rose* were on the brief, for appellants in No. 165:

The case of the Government fails for want of proof. It will be presumed that the Martin-Alexander Company preferred legal to illegal entries. *United States* v. *Budd,* 144 U. S. 154, 163. Legal sales of timber lands subsequent to entries do not prove illegal prior contracts to sell. The finding of the judge in the Circuit Court who heard the testimony

that there was no fraud or violation of law is entitled to great respect.

The testimony may indicate improvidence and loose business methods by the entrymen, but it does not show any purpose to enter land for the benefit of anyone else. Buying for sale at a profit, could not have been what the act meant by speculation. As it applies only to land valuable for timber or stone, the entrymen could derive no benefit from the land except by selling it. Only a mill man could make the entry for the purpose of using the timber, and it would not be contended that the benefits of the act were intended to be confined to them.

The meaning of the word "speculation" in the act is not obvious. If used in its ordinary meaning the purpose of the act would be defeated, and therefore that cannot be the meaning intended. It means only that the entryman does not intend to speculate on the privilege acquired by the application; but to complete the entry and acquire the land for the benefit to result to him by reason of owning it. *Myers* v. *Croft*, 13 Wall. 294; Sec'y of Interior MSS. Op., Dec. 10, 1903, *Re Donahue et al.;* see sub. "Speculation," Bouvier's Law Dict.; Century Dictionary; Webster's Dictionary of 1896 and 1903, changing definitions of edition of 1887. And as to construction of the act see *United States* v. *Budd, supra; United States* v. *Clark*, 125 Fed. Rep. 774. *United States* v. *Bailey*, 17 L. D. 468, and *Hawley* v. *Diller*, 178 U. S. 476, 495, distinguished.

The Detroit Company was an innocent purchaser for value. The testimony is clearly to the effect that it had no affirmative notice or knowledge.

Where it is sought to charge a purchaser for value with *mala fides* the burden is upon the complainant to show, either actual knowledge of the fraud, or knowledge of some fact, that would make it his duty to inquire, and his failure to do so an act of gross or culpable negligence. *Townsend* v. *Little,* 109 U. S. 504; *Meehon* v. *Williams*, 48 Pa. St. 238; *Wilson* v. *Wall*,

6 Wall. 83; Devlin on Deeds, 1st ed., § 729; *Hall* v. *Livingston,* 3 Del. Ch. 348; *Shepherd* v. *Shepherd,* 36 Michigan, 173; *Hardy* v. *Harbin,* 1 Sawyer, 194; *Mills* v. *Smith,* 8 Wall. 27; *Colorado C. & I. Co.* v. *United States,* 123 U. S. 307; *Crawford* v. *Neal,* 144 U. S. 585; *Jones* v. *Simpson,* 116 U. S. 609.

The officers of the Detroit Company were only bound to investigate the public records. According to those there was no illegality. They were correct according to statute, 2 U. S. Comp. Stat., p. 1546, and see *Lea* v. *Polk County Copper Co.,* 21 How. 493; *Bagnell* v. *Broderick,* 13 Pet. 448; *United States* v. *California & Oregon Land Co.,* 148 U. S. 31; *United States* v. *Minor,* 29 Fed. Rep. 134; *Simmons* v. *Moore,* 2 Fed. Rep. 325.

A vendee is not bound to inquire of the parties to a conveyance whether they are committing a fraud by suppressing anterior deed, etc., for it is evidence that if fraud was intended, deception would be carried out by denial. Such inquiries are not resorted to in practice in business transactions. 2 Hare & Wallace Notes to Leading Cases in Equity, 66; *Miller* v. *Froley,* 23 Arkansas, 745; *Ferguson* v. *May,* 4 Ky. Law. Rep. 989.

A concealed defect or secret equity arising from the conduct of those who originally owned the property of which the purchaser had no notice cannot be set up against him. *Danberry* v. *Robinson,* 14 N. J. Eq. 213.

To secure in equity all the rights of a *bona fide* and duly vigilant purchaser one is not required to make inquiry whether there is fraud or trust where the title and possession give no indication that there is either. *Leach* v. *Ausbacher,* 55 Pa. St. 85; *Yardly* v. *Torr,* 67 Fed. Rep. 857; *Fletcher* v. *Peck,* 6 Cranch, 135; *Anderson* v. *Roberts,* 18 Johns. Rep. 531; 21 Am. & Eng. Ency. of Law, 588.

. Even if the officers of the Detroit Company knew of the facts they still acted in good faith as they were in no way connected with the frauds alleged. *United States* v. *Southern Pacific Co.,* 184 U. S. 54.

At the time this suit was brought the Detroit Company had not only the equitable but the legal title to the property. Kirby's Stat. of Arkansas, § 734. As to *Hawley* v. *Diller*, *supra*, see 1 Story's Eq. Jur. 64; 2 Pomeroy Eq. Jur. §§ 740, 766; *United States* v. *Winona & St. Peters R. R. Co.*, 165 U. S. 463.

There is no testimony that the Detroit Company procured the lands for an inadequate consideration. But had they done so in fact, there are authorities that hold that all that was necessary was that the consideration should be valuable. 23 Am. & Eng. Ency. of Law, 488; *Bullock* v. *Sadlier*, Ambler, 763; *Dean* v. *Anderson*, 34 N. J. Eq. 508; Wait on Fraud. Convey. and Creditors' Bills, 1st ed., § 369.

It does not matter in this case that the Detroit Company did not acquire the legal title when it paid the purchase price. It acquired a right to call for a legal estate. Pomeroy's Equity, § 727; Adams's Equity, 161; *Deuber Co.* v. *Daugherty*, 62 Ohio St. 589. And that is sufficient. 23 Am. & Eng. Ency. of Law, 486; *St. Johnsbury* v. *Morrill*, 55 Vermont, 165; notes to *Bassett* v. *Nosworthy*, 2 Leading Cases in Equity, 102; *United States* v. *Clark*, 125 Fed. Rep. 774.

There was no merger of the two companies but an actual transfer. 1 Thompson on Corp. § 315; 6 Am. & Eng. Ency. of Law, 802; *The Key City*, 14 Wall. 653; *McAlpine* v. *Union Pacific Railway Co.*, 23 Fed. Rep. 168.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The able and elaborate opinions of both the Circuit Court and the Court of Appeals relieve us from much labor. There are two questions of fact: First, whether the parties making the entries had, prior to acquiring title from the Government, made any agreement with the Martin-Alexander Company for a conveyance of an interest in the properties, or were seeking to acquire title solely for their own benefit. Second, whether

the Detroit Company was a purchaser in good faith from the Martin-Alexander Company. With reference to the first question, the Circuit Court was of the opinion that there were no agreements between the parties. The Court of Appeals was of a different opinion, and held that the entries were made in pursuance of such agreements. This is a case in equity, and while in such a case questions of fact are always open to consideration by an appellate court, great respect is paid to the conclusions of the trial court in respect to them. Certainly, if the Circuit Court and the Court of Appeals had agreed we should be very loath to disturb their conclusions. Differing as they do in the present case, we have examined this question, and agree with the Court of Appeals. The entire management of these entries was in the hands of an agent of the Martin-Alexander Company. It furnished the moneys, both for the purchase prices and all expenses, and it is not easy to believe that it did all this on a mere expectation that after the entries had been made it could purchase the timber. It is a much more reasonable conclusion that it had an understanding with the parties making the entries respecting purchases and prices. It is quite likely that the entrymen were not conscious of wronging the Government, and thought that if it received the full price demanded that was enough. The testimony of one witness suggests at least that they may have been advised that there was no contract unless it was in writing, and that hence they could conscientiously take the oath required in connection with an entry. So, without casting any imputation of intentional perjury on those parties, we agree with the Court of Appeals that the testimony points strongly to the fact that the entries were in pursuance of an understanding or agreement with the Martin-Alexander Company, that, as it was advancing all the money, the entrymen should convey to it the standing timber at a fixed price.

With reference to the second question of fact, the Circuit Court made no finding, having disposed of the case by its conclusion in respect to the first. The Court of Appeals found

that the Detroit Company was a purchaser in good faith from the Martin-Alexander Company. Here, too, we have examined the testimony, and are satisfied that the conclusion of the Court of Appeals was correct. A brief statement of the salient facts may be not unimportant. The headquarters of the Detroit Company were in St. Louis, of the Martin-Alexander Company in southwest Arkansas. They dealt at arm's length. On December 20, 1900, Alexander, of the Martin-Alexander Company, applied to U. L. Clark, president of the Detroit Company, at St. Louis, to purchase Martin's interest in the Martin-Alexander Company. Clark declined, stating that the Detroit Company would make no purchase of a fractional interest in the property. Thereupon it was arranged that he should make an examination with a view to the purchase of the entire property. The Detroit Company's inspector was sent to Arkansas to examine the lands. Clark himself went down in the January following, and, after receiving the report of the inspector, terms of sale were, on January 14, agreed upon; $60,000 cash and the assumption of the Martin-Alexander Company's debts. The $60,000, by agreement between the stockholders of the Martin-Alexander Company, were divided, $34,850 to Martin, $24,850 to Mrs. Alexander, $150 to A. V. Alexander, and $150 to J. O. Means. Martin and Means were paid at once; the debts were also promptly paid. Alexander desired to take stock in the Detroit Lumber Company in lieu of the money coming to his wife and himself. Clark was not then authorized to make such arrangement, but subsequently the stock of the Detroit Lumber Company was increased and the Alexanders were paid in full in that stock. The entire property of the Martin-Alexander Company, included in which were the sawmill, tram and logging roads, these timber contracts and other like contracts and also all stock on hand, was at the time of the purchase, January 14, turned over to the Detroit Lumber Company, which thereafter continued the business. The Martin-Alexander Company had no deeds of the lands in controversy, but simply contracts for the timber

thereon, and in order to be relieved from the necessity of keeping accounts with respect to the different tracts the Detroit Company proceeded to obtain deeds from twenty-seven of the patentees, paying on an average $25 apiece therefor, which was a fair price for the lands after the timber had been cut off. It had no knowledge or intimation that there was anything wrong in the titles until the last of September or the first of October, 1901,—more than four months after the Government had issued its patents for all the lands—when it received a notice to that effect from a Government inspector.

Now we remark that there is no intimation in the testimony that the purchase price was not paid by the Detroit Company in cash and stock as agreed upon, no suggestion that the price was an unreasonable one. . There was nothing strange or unnatural in the contract between the companies; on the contrary it was one which might well be entered into by parties situated as these were. But it is contended by the Government that if the Detroit Company had examined with care the books of the Martin-Alexander Company, and the papers which it turned over as evidences of its titles, it would have perceived that the timber contracts were made shortly after the issue of the final receiver's receipts, that the parties making the contracts were all or nearly all employés of the Martin-Alexander Company, to whom moneys had been advanced, and with each of whom an account was being kept; that it was its duty to critically examine these matters in order to be sure that the titles which it was acquiring were good. In their brief counsel for the Government say:

"We claim that the law as laid down in *Hawley* v. *Diller*, that one who takes title before the issuance of patent cannot claim to be a *bona fide* purchaser, made it the duty of the Detroit Company to make the most searching inquiry at least as to all of the timber contracts except the thirteen for which patents to the land had issued."

We do not understand the law to be as stated, or that one who enters into an ordinary and reasonable contract for the

purchase of property from another is bound to presume that the vendor is a wrongdoer, and that, therefore, he must make a searching inquiry as to the validity of his claim to the property. The rule of law in respect to purchases of land or timber is the same as that which obtains in other commercial transactions, and such a rule as is claimed by counsel would shake the foundations of commercial business. No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying full value for the same, acquire the rights of a purchaser in good faith. *Jones* v. *Simpson,* 116 U. S. 609, 615. He is not bound to make a searching examination of all the account books of the vendor nor to hunt for something to cast a suspicion upon the integrity of the title.

It is further said that the written contract of sale from the Martin-Alexander Company to the Detroit Company was not executed till March 1, 1901, and that on the fourteenth of January, 1901, Martin resigned his position as president of the Martin-Alexander Company, and Clark, the president of the Detroit Company, was elected president of the former company; that, as the chief executive of that company, he was charged with knowledge of all that the company knew, and that therefore, before the written contract was entered into, he and the Detroit Company had constructive notice of the wrongful character of these timber contracts. But that is a mere evasive technicality. The bill charges and the answer admits the sale on January 14, and the facts, as disclosed by the testimony, are that Martin desired to leave at once on receipt of his money and return to his home in Illinois; that Clark was put in his place as president to enable the Martin-Alexander Company to close up its outstanding affairs. The real contract between the parties was entered into before Clark became president, and all that was afterwards done was simply to put in writing the terms of the contract which had been

agreed upon. Equity looks at the substance and not at the mere form in which a transaction takes place. The rule in respect to constructive notice was thus stated in *Wilson* v. *Wall*, 6 Wall. 83, 90, 91:

"A chancellor will not be astute to charge a constructive trust upon one who has acted honestly and paid a full and fair consideration without notice or knowledge. On this point we need only to refer to Sugden on Vendors, p. 622, where he says: 'In *Ware* v. *Lord Egmont* the Lord Chancellor Cranworth expressed his entire concurrence in what, on many occasions of late years, had fallen from judges of great eminence on the subject of constructive notice, namely, that it was highly inexpedient for courts of equity to extend the doctrine. When a person has not actual notice he ought not to be treated as if he had notice unless the circumstances are such as enable the court to say, not only that he might have acquired, but also that he ought to have acquired it but for his gross negligence in the conduct of the business in question. The question then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining and might by prudent caution have obtained the knowledge in question, but whether not obtaining was an act of gross or culpable negligence.' "

And, again, in *Townsend* v. *Little*, 109 U. S. 504, 511:

"Constructive notice is defined to be in its nature no more than evidence of notice, the presumption of which is so violent that the court will not even allow of its being controverted. *Plumb* v. *Fluitt*, 2 Anst. 432; *Kennedy* v. *Green*, 3 My. & K. 699. . . . As said by Strong, J., in *Meehan* v. *Williams*, 48 Penn. State, 238, what makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell. See also *Holmes* v. *Stout*, 3 Green Ch. 492; *McMechan* v. *Griffing*, 3 Pick. 149; *Harwick* v. *Thompson*, 9 Alabama, 409."

In the light of these authorities we see nothing which casts any imputation on the conduct of the Detroit Company, or

that tends to show that it was not a purchaser in absolute good faith.

Now, what is the law controlling under these circumstances? Much reliance is placed by the Government on *Hawley* v. *Diller*, 178 U. S. 476, which, affirming prior cases, holds that an entryman under the timber act acquires only an equity, and that a purchaser from him cannot be regarded as a *bona fide* purchaser within the meaning of the act. But the Detroit Company purchased twenty-seven tracts after the issue of the patents therefor. And in making these purchases it dealt, not with the Martin-Alexander Company, but directly with the patentees. While the amounts paid were small, yet, as counsel for the Government admit in their brief that "the land without the timber is of no value," there can be no suggestion of inadequacy of price. As, also, it had no knowledge or suspicion of wrong in the titles, it is, as to these tracts, strictly and technically, within the language of the act, a *bona fide* purchaser. If it be contended that, by virtue of the contracts for the sale of timber, it had acquired some interest in the lands prior to the issue of patents, it is sufficient to say that by the doctrine of relation the patents, when issued, became operative as of the dates of the entries. It is true that this doctrine is but a fiction of law, but it is a fiction resorted to whenever justice requires. It is that principle by which an act done at one time is considered to have been done at some antecedent time. It is a doctrine of frequent application, designed to promote justice. Thus, a sheriff's deed takes effect not of its date, but of the time when the lien of the judgment attached. The ordinary railroad land grants have been grants *in presenti*, and under them the title has been adjudged to pass, not at the completion of the road, but at the date of the grant. *Leavenworth, Lawrence & Galveston Railroad* v. *United States*, 92 U. S. 733; *St. Paul &c. Railway Co.* v. *Phelps*, 137 U. S. 528; *St. Paul & Pacific* v. *Northern Pacific*, 139 U. S. 1; *United States* v. *Southern Pacific Railroad*, 146 U. S. 570. A patent from the United States operates to transfer the title, not merely from the date of the

patent, but from the inception of the equitable right upon which it is based. *Shepley* v. *Cowan*, 91 U. S. 330. Indeed, this is generally true in case of the merging of an equitable right into a legal title. Although the patents in this case were not issued until after the sales of the timber, yet when issued they became operative as of the date of the original entries. This doctrine has frequently been recognized by this and other courts. *Landes* v. *Brant*, 10 How. 348; *Lessee of French and Wife* v. *Spencer*, 21 How. 228; *Stark* v. *Starrs*, 6 Wall. 402; *Lynch* v. *Bernal*, 9 Wall. 315; *Gibson* v. *Chouteau*, 13 Wall. 92; *Simmons* v. *Wagner*, 101 U. S. 260; *Jackson* v. *Ramsey*, 3 Cow. 75; *Welch* v. *Dutton*, 79 Illinois, 465; *Ormiston, Guardian*, v. *Trumbo, Admr.*, 77 Mo. App. 310. In the first of these cases it was said (p. 372):

"To protect purchasers, the rule applies, 'that where there are divers acts concurrent to make a conveyance estate, or other thing, the original act shall be preferred; and to this the other acts shall have relation,' as stated in Viner's Abr. tit. Relation, 290. . . .

"Cruise on Real Property, vol. V, pp. 510, 511, lays down the doctrine with great distinctness. He says: 'There is no rule better founded in law, reason, and convenience than this, that all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation.' . . .

"Applying the doctrine of relation, and taking all the several parts and ceremonies necessary to complete the title together, 'as one act,' then the confirmation of 1811 and the patent of 1845 must be taken to relate to the first act; that of filing the claim in 1805."

In *Simmons* v. *Wagner*, p. 261:

"Where the right to a patent has once become vested in a purchaser of public lands, it is equivalent, so far as the Government is concerned, to a patent actually issued. The execution and delivery of the patent after the right to it has become complete are the mere ministerial acts of

the officers charged with that duty. *Barney* v. *Dolph,* 97 U. S. 652."

See also *United States* v. *Freyberg,* 32 Fed. Rep. 195, a case in the Circuit Court for the Eastern District of Wisconsin, in which it was held by Judge Dyer that an action brought by the Government to recover for timber cut from land, which had been entered as a homestead, but the full equitable title of which had not then passed to the entryman, either by the required occupation of the premises or by a commuting of the homestead to a preëmption entry—an action maintainable at the time it was commenced—was defeated by the issue of the final receiver's receipt and the consequent perfection of a full equitable title.

Counsel for the Government deny the application of this principle in the present case on the ground, first, that it gives vitality and validity to a wrongful acquisition of title from the Government. They say that equity is never founded on a wrong, and that because the original entries were wrongful the doctrine of relation will not be applied. But this is a clear misunderstanding of the purpose and scope of the doctrine of relation. If the original entries were rightful there is no need of its application, for the patents would pass perfect titles. The equity is founded on the rightful conduct of the purchaser and not on the wrongful conduct of the entrymen. It upholds the purchaser in his honest purchase notwithstanding the wrongful character of the entries. This is akin to the ordinary rule in respect to a *bona fide* purchaser. Equity sustains the title in spite of the fact that his grantor may have wrongfully obtained it, and upholds it because of his rightful conduct.

Counsel also say that the question is settled by the decision in *Hawley* v. *Diller, supra,* relying upon the second paragraph in the headnotes:

"An entryman under this act acquires only an equity, and a purchaser from him cannot be regarded as a *bona fide* purchaser within the meaning of the act of Congress unless he becomes

such after the Government, by issuing a patent, has parted with the legal title."

There are two or three answers to this contention. In the first place, the headnote is not the work of the court, nor does it state its decision—though a different rule, it is true, is pre-scribed by statute in some States. It is simply the work of the reporter, gives his understanding of the decision, and is prepared for the convenience of the profession in the examination of the reports. In the second place, if the patent referred to in that headnote is a patent issued upon a wrongful entry, no such fact appeared in the case, because no patent was issued upon the entry charged to have been wrongful, but after that entry had been cancelled, a patent was issued to Diller on a new entry. If it refers to some other patent than one issued upon a wrongful entry, it has no pertinency, for the doctrine of relation never carries a patent back to the date of any other entry. than that upon which it is issued. And finally the headnote is a misinterpretation of the scope of the decision.

With reference to the other tracts and the denial of any relief, by accounting or otherwise, against the Detroit Company, it is contended that as prior to the issue of a patent the Land Department could have set aside the entries on account of the fraudulent contracts, the courts will now grant the same relief; and further, that inasmuch as the patents are by this decree cancelled and the title restored to the Government the Detroit Company must be regarded as a wrongdoer in respect to the timber which it took from the lands prior to the decree, and an accounting should have been ordered. But this ignores the fact that the Detroit Company acted in good faith and purchased the timber from those having an apparently perfect equitable title thereto. It becomes necessary to inquire what is the significance of a final receiver's receipt and the effect of a cancellation by the Land Department of such a receipt. The receipt is an acknowledgment by the Government that it has received full pay for the land, that it holds the legal title in trust for the entryman and will in due course issue to

him a patent. He is the equitable owner of the land. It becomes subject to state taxation, and under the control of state laws in respect to conveyances, inheritances, etc. *Carroll* v. *Safford,* 3 How. 441; *Witherspoon* v. *Duncan,* 4 Wall. 210; *Simmons* v. *Wagner, supra; Winona & St. Peter Land Co.* v. *Minnesota,* 159 U. S. 526; *Cornelius* v. *Kessel,* 128 U. S. 456; *Hastings & Dakota R. R. Co.* v. *Whitney,* 132 U. S. 357; *Benson Mining Co.* v. *Alta Mining Co.,* 145 U. S. 428.

Indeed, in some of the opinions of this court, emphasizing the value of a receiver's receipt, there are expressions which seem to underestimate the significance of a patent. *Wisconsin Central R. R. Co.* v. *Price County,* 133 U. S. 496, 510; *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241, 251. For it must be remembered that the latter is the instrument which passes the legal title, and that until it is issued the legal title remains with the Government and is subject to investigation and determination by the Land Department. *Barden* v. *Northern Pacific R. R. Co.,* 154 U. S. 288, 326; *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589, 592; *Guaranty Savings Bank* v. *Bladow,* 176 U. S. 448. But while until the issue of the patent the land is under the control of the Land Department, which, upon proper investigation and for sufficient reasons, may set aside the certificate of entry, yet this power of the Land Department cannot arbitrarily be exercised without notice to the entryman, and if improperly exercised the rights of the entryman may be enforced in the courts after the patent has issued to other parties. *Guaranty Savings Bank* v. *Bladow, supra.* It is true, as against the Government, and while the title remains in the Government, he may not be able to enforce his equity, because no action can be maintained against the Government, except upon contract, express or implied. *United States* v. *Jones,* 131 U. S. 1. But while he may not sue on his equity, he may protect that equity when sued by the Government. It is sometimes said that a legal title with an equity is paramount to an equity alone, but this is not strictly true unless the equities are equal, for sometimes a superior equity

may be adjudged paramount to a legal title and an inferior equity.  *Garland* v. *Wynn,* 20 How. 6; *Lytle* v. *Arkansas,* 22 How. 193; *Lindsey* v. *Hawes,* 2 Black, 554; *Wirth* v. *Branson,* 98 U. S. 118; 2 Pomeroy's Eq. Jur. § 678, and following.  But we need not stop to inquire what rights the Detroit Company will have after a patent has issued.  It is enough now to hold that it can defend its equities against the suit of the Government.

It is a mistake to suppose that for the determination of equities and equitable rights we must look only to the statutes of Congress.  The principles of equity exist independently of and anterior to all Congressional legislation, and the statutes are either annunciations of those principles or limitations upon their application in particular cases.  In passing upon transactions between the Government and its vendees we must bear in mind the general principles of equity and determine rights upon those principles except as they are limited by special statutory provisions.  And clearly upon those principles a party purchasing an equitable right is entitled to be protected in his purchase so far as it can be done without trespassing upon the rights of other parties.  The statute provides that if an entry is wrongfully made it may, prior to patent, be set aside by the Land Department, the entryman forfeiting the money which he has paid.  In other words, by the action of the Department the equitable title is cancelled and restored to the Government.  It then has both the full title to the land and the money which had been paid for it.  And this is the penalty which is imposed for the wrongful entry.  Certainly when the Government retains the full price which it has placed upon the land and also recovers the land itself it is abundantly compensated for any wrong which has been attempted by the entryman.  And a party who deals with such entryman—relying upon the evidences of his entry, which are in all respects in form good and sufficient, and are an acknowledgment by the Government officials of a rightful entry—is justly entitled to the consideration of a court of equity.  In this case, finding

the entrymen holding apparently valid equitable titles to the lands, it entered into contracts with them for the purchase of the timber. It cut and removed the timber—all in good faith. It is equitable that, having thus acted in good faith, it should not be held to account for the timber which it has already paid for and cut and removed in reliance upon these contracts. The Government has every dollar which it would have received in case of a perfectly valid entry, and has also recovered the land. Surely it is not just for it to ask further payment, and from a party who dealt in good faith with the entrymen, relying upon the titles which it had created. If the Detroit Company has taken some timber from the land it has once paid for it, and ought not to be compelled to pay a second time, and to the Government, which has already received full pay for the land, timber and all. It is inequitable to give to the Government not merely the land, and the price which it charged for the land, but also the value of the timber obtained by the Detroit Company. It is doubling the penalty which the statute imposes, or if not doubling, at least largely increasing it.

We think the decision of the Court of Appeals was right, and it is

*Affirmed.*

Mr. Justice Harlan and Mr. Justice McKenna dissent.