Justice THOMAS, concurring.
I join the Court's opinion and write separately to explain my understanding of the relevant pre-emption principles and how they apply to this case.
The Supremacy Clause of the Constitution provides:
"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2.
Under this Clause, "[w]here state and federal law 'directly conflict,' state law must give way." PLIVA, Inc. v. Mensing , 564 U. S. 604, 617, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Although the Court has articulated several theories of pre-emption, Merck's sole argument here is that state law is pre-empted because it is impossible for Merck to comply with federal and state law. I remain skeptical that "physical impossibility" is a proper test for deciding whether a direct conflict exists between federal and state law. But even under our impossibility precedents, Merck's pre-emption defense fails.
I
As I have explained before, it is not obvious that the " 'physical impossibility' standard is the best proxy for determining when state and federal laws 'directly conflict' for purposes of the Supremacy Clause." Wyeth v. Levine , 555 U. S. 555, 590, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (opinion concurring in judgment). Evidence from the founding suggests that, under the original meaning of the Supremacy Clause, federal law pre-empts state law only if the two are in logical contradiction. See ibid. ; Nelson, Preemption, 86 Va. L. Rev. 225, 260-261 (2000). Sometimes, federal law will logically contradict state law even if it is possible for a person to comply with both. For instance, "if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." Wyeth , 555 U. S. at 590, 129 S.Ct. 1187 (opinion of THOMAS, J.).
Merck does not advance this logical-contradiction standard, and it is doubtful that a pre-emption defense along these lines would succeed here. "To say, as the statute does, that [Merck] may not market a drug without federal approval (i.e. , without [a Food and Drug Administration (FDA) ] approved label) is not to say that federal approval gives [Merck] the unfettered right, for all time, to market its drug with the specific label that was federally approved." Id. , at 592, 129 S.Ct. 1187. Nothing in the federal brand-name-drug "statutory or regulatory scheme necessarily insulates [Merck] from liability under state law simply because the FDA has approved a particular label." Id., at 593, 129 S.Ct. 1187. The relevant question would be whether federal law gives Merck "an unconditional right to market [a] federally approved drug at all times with the precise label initially approved by the FDA," id., at 592, 129 S.Ct. 1187, or whether it instead provides a federal floor that can be supplemented by different state standards, see Brief for Cato Institute as Amicus Curiae 14, n. 4. Absent a federal statutory right to sell a brand-name drug with an FDA-approved label, *1682 FDA approval "does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law." Wyeth , supra , at 592, 129 S.Ct. 1187 (opinion of THOMAS, J.).
II
Applying the Court's impossibility precedents leads to the same conclusion. The question for impossibility is whether it was "lawful under federal law for [Merck] to do what state law required of" it. Mensing , 564 U. S. at 618, 131 S.Ct. 2567. Because "[p]re-emption analysis requires us to compare federal and state law," I "begin by identifying the [relevant] state tort duties and federal labeling requirements." Id. , at 611, 131 S.Ct. 2567. Respondents' claim here is "that state law obligated Merck to add a warning about atypical femur fractures" to the Warnings and Precautions section of Fosamax's label. In re Fosamax (Alendronate Sodium) Prods. Liability Litig. , 852 F. 3d 268, 282 (CA3 2017). Under the Federal Food, Drug, and Cosmetic Act, a manufacturer of a brand-name drug "bears responsibility for the content of its label at all times." Wyeth , 555 U. S. at 570-571, 129 S.Ct. 1187 (majority opinion). The manufacturer "is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." Id. , at 571, 129 S.Ct. 1187. Generally, to propose labeling changes, the manufacturer can submit a Prior Approval Supplement (PAS) application, which requires FDA approval before the changes are made. 21 C.F.R. § 314.70(b) (2018). Alternatively, under the FDA's Changes Being Effected (CBE) regulation, if the manufacturer would like to change a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" "to reflect newly acquired information," it can change the label immediately upon filing its supplemental application with the FDA, without waiting for FDA approval. § 314.70(c)(6)(iii) ; see Wyeth , supra , at 568, 129 S.Ct. 1187. If the FDA later disapproves the CBE application, "it may order the manufacturer to cease distribution of the drug product(s)" with the new labeling. § 314.70(c)(7).
Here, Merck's impossibility pre-emption defense fails because it does not identify any federal law that "prohibited [it] from adding any and all warnings ... that would satisfy state law." Ante, at 1678. By its reference to "the Laws of the United States," the Supremacy Clause "requires that pre-emptive effect be given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures." Wyeth , supra , at 586, 129 S.Ct. 1187 (opinion of THOMAS, J.). Merck's primary argument, based on various agency communications, is that the FDA would have rejected a hypothetical labeling change submitted via the CBE process. But neither agency musings nor hypothetical future rejections constitute pre-emptive "Laws" under the Supremacy Clause.
As the Court describes, in 2008 Merck submitted PAS applications to add certain language regarding fractures to the Adverse Reactions and the Warnings and Precautions sections of Fosamax's label. Ante , at 1674 - 1675. In 2009, the FDA sent Merck a "complete response" letter "agree[ing] that atypical and subtrochanteric fractures should be added" to the Adverse Reactions section. App. 510-511. But the letter said that Merck's proposed Warnings and Precautions language, which focused on "the risk factors for stress fractures," was "inadequate" because "[i]dentification of 'stress fractures ' may not be clearly related to the atypical subtrochanteric *1683 fractures that have been reported in the literature." Id ., at 511. In accord with FDA regulations, the letter required Merck to take one of three actions: (1) "[r]esubmit the application ..., addressing all deficiencies identified in the complete response letter"; (2) "[w]ithdraw the application ... without prejudice to a subsequent submission"; or (3) "[a]sk the agency to provide ... an opportunity for a hearing," after which "the agency will either approve" or "refuse to approve the application." 21 C.F.R. § 314.110(b) ; see App. 512. As this regulation suggests and the FDA has explained, complete response letters merely "infor[m] sponsors of changes that must be made before an application can be approved, with no implication as to the ultimate approvability of the application ." 73 Fed. Reg. 39588 (2008) (emphasis added). In other words, the 2009 letter neither marked "the consummation of the agency's decisionmaking process" nor determined Merck's "rights or obligations." Bennett v. Spear , 520 U. S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks omitted). Instead, it was "of a merely tentative or interlocutory nature." Ibid. Therefore, the letter was not a final agency action with the force of law, so it cannot be "Law" with pre-emptive effect.
Merck's argument that the 2009 letter and other agency communications suggest that the FDA would have denied a future labeling change fares no better: hypothetical agency action is not "Law." As Merck acknowledges, it could have resubmitted its PAS applications, sought a hearing, or changed its label at any time through the CBE process. See Reply Brief 13. Indeed, when Merck instead decided to withdraw its PAS applications, it added atypical femoral fractures to the Adverse Reactions section through the CBE process. That process also enabled Merck to add language to the Warnings and Precautions section, but Merck did not do so. If it had, it could have satisfied its federal and alleged state-law duties-meaning that it was possible for Merck to independently satisfy both sets of duties. Merck's belief that the FDA would have eventually rejected a CBE application does not make an earlier CBE change impossible. As the Court correctly explains, " 'the possibility of impossibility [is] not enough.' " Ante, at 1678 - 1679. The very point of the CBE process is that a manufacturer can "unilaterally" make a labeling change that does not violate other federal law, Wyeth , 555 U. S. at 573, 129 S.Ct. 1187 ; see id., at 570, 129 S.Ct. 1187 ; e.g., 21 U.S.C. § 352, at least until the FDA rules on its application.*
Because Merck points to no statute, regulation, or other agency action with the force of law that would have prohibited it from complying with its alleged state-law *1684 duties, its pre-emption defense should fail as a matter of law.
Justice ALITO, with whom THE CHIEF JUSTICE and Justice KAVANAUGH join, concurring in the judgment.
I concur in the judgment because I agree with the Court's decision on the only question that it actually decides, namely, that whether federal law allowed Merck to include in the Fosamax label the warning alleged to be required by state law is a question of law to be decided by the courts, not a question of fact. I do not, however, join the opinion of the Court because I am concerned that its discussion of the law and the facts may be misleading on remand.
I
I begin with the law. The Court correctly notes that a drug manufacturer may prove impossibility pre-emption by showing that "federal law (including appropriate [Food and Drug Administration (FDA) ] actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." Ante, at 1678. But in expounding further on the pre-emption analysis, the Court provides a skewed summary. While dwelling on our decision in Wyeth v. Levine , 555 U. S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), see ante, at 1676 - 1679, the Court barely notes a statutory provision enacted after the underlying events in that case that may have an important bearing on the ultimate pre-emption analysis in this case.
Under 21 U.S.C. § 355(o )(4)(A), which was enacted in 2007, Congress has imposed on the FDA a duty to initiate a label change "[i]f the Secretary becomes aware of new information, including any new safety information ... that the Secretary determines should be included in the labeling of the drug."* This provision does not relieve drug manufacturers of their own responsibility to maintain their drug labels, see § 355(o )(4)(I), but the FDA's "actions," ante, at 1678, taken pursuant to this duty arguably affect the pre-emption analysis. This is so because, if the FDA declines to require a label change despite having received and considered information regarding a new risk, the logical conclusion is that the FDA determined that a label change was unjustified. See United States v. Chemical Foundation, Inc. , 272 U. S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). The FDA's duty does not depend on whether the relevant drug manufacturer, as opposed to some other entity or individual, brought the new information to the FDA's attention. Cf. ante, at 1678 ("the drug manufacturer [must] show that it fully informed the FDA of the justifications for the warning required by state law"). Nor does § 355(o )(4)(A) require the FDA to communicate to the relevant drug manufacturer that a label change is unwarranted; instead, the FDA could simply consider the new information and decide not to act. Cf. ante, at 1678 ("[T]he FDA, in turn, [must have] informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning").
*1685 Section 355(o )(4)(A) is thus highly relevant to the pre-emption analysis, which turns on whether "federal law (including appropriate FDA actions ) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." Ante, at 1678 (emphasis added). On remand, I assume that the Court of Appeals will consider the effect of § 355(o )(4)(A) on the pre-emption issue in this case.
Two other aspects of the Court's discussion of the legal background must also be mentioned. First, although the Court's discussion of the point is a bit opaque, the Court holds-correctly, in my view-that Wyeth 's use of the phrase "clear evidence" was merely a rhetorical flourish. As the Court explains, a judge, in determining whether federal law would permit a label change allegedly required by state law, "must simply ask himself or herself whether the relevant federal and state laws 'irreconcilably conflic[t].' " Ante, at 1679 (quoting Rice v. Norman Williams Co. , 458 U. S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982) ). Standards of proof, such as preponderance of the evidence and clear and convincing evidence, have no place in the resolution of this question of law.
Second, for reasons that entirely escape me, the Court refuses to acknowledge that there are two ways in which a drug manufacturer may attempt to alter a drug's label. The Court notes that a manufacturer may proceed under the FDA's " 'changes being effected' " or " 'CBE' " regulation, which permits a manufacturer to change a label without prior FDA approval under some circumstances. See ante, at 1673 - 1674, 1679. But the Court refuses to note that a manufacturer may (and, in many circumstances, must) submit a Prior Approval Supplement (PAS). 21 C.F.R. § 314.70(b) (2018). As the name suggests, changes proposed in a PAS must receive FDA approval before drug manufacturers may make the changes. § 314.70(b)(3). And "[h]istorically," the FDA has "accepted PAS applications instead of CBE supplements, as occurred in this case, particularly where significant questions exist on whether to revise or how to modify existing drug labeling." Brief for United States as Amicus Curiae 5.
II
I now turn to the facts. Resolution of the legal question that the Court decides does not require much discussion of the facts, but if the Court wishes to include such a summary, its presentation should be balanced. Instead, the Court provides a one-sided account. For example, it highlights historical accounts dating back to the 1990s that purportedly linked atypical femoral fractures with Fosamax use, see ante, at 1674, 1675, but it omits any mention of the extensive communication between Merck and the FDA during the relevant period.
A reader of the Court's opinion will inevitably be left with the impression that, once the FDA rejected Merck's proposed warning in 2009, neither the FDA nor Merck took any other actions related to atypical femoral fractures"until 2011," ante, at 1674 - 1675. But that is simply not true.
While Merck's 2008 proposal was pending, the FDA remained in contact with Merck about the issue of atypical femoral fractures, which Merck, at the time, labeled as a type of stress fracture. See, e.g., App. 707, 746-748. An internal Merck memorandum describes a phone call in which an FDA official allegedly told Merck that "[t]he conflicting nature of the literature does not provide a clear path forward, and more time will be need[ed] for FDA to formulate a formal opinion on the issue of a precaution around these data." Id., at 767. In an e-mail about a week later, another *1686 FDA official told Merck that the FDA would "close out" Merck's applications if Merck "agree[d] to hold off on the [Precautions] language at this time." Id., at 508. The official went on to say that the FDA "would then work with ... Merck to decide on language for a [Precautions] atypical fracture language, if it is warranted." Ibid.
Then, months after the FDA rejected Merck's proposed warning, the FDA issued a Safety Announcement regarding its "[o]ngoing safety review of oral bisphosphonates and atypical subtrochanteric femur fractures." Id., at 519. The Safety Announcement stated that, "[a]t this point, the data that FDA has reviewed have not shown a clear connection between bisphosphonate use and a risk of atypical subtrochanteric femur fractures." Ibid. Nonetheless, the Safety Announcement announced the FDA's intent to further study the issue alongside a task force formed to address the atypical fractures.Id., at 519-520. And the Safety Announcement concluded by admonishing healthcare professionals to "continue to follow the recommendations in the drug label when prescribing oral bisphosphonates" and patients to "not stop taking their medication unless told to do so by their healthcare professional." Id., at 520-521.
In September 2010, the task force published its report, which concluded that, although there was no established "causal association" between bisphosphonates and atypical femoral fractures, "recent observations suggest that the risk rises with increasing duration of exposure, and there is concern that lack of awareness and underreporting may mask the true incidence of the problem." Id., at 284. The same day, the FDA issued a statement acknowledging the task force report and committing to "considering label revisions." Id., at 523-525. And in October 2010, the FDA issued another Safety Announcement in which the FDA stated that it would initiate changes in the Precautions section of bisphosphonate drug labels to warn of atypical femoral fractures. Id., at 246-249. It was not until then that, pursuant to its § 355(o )(4)(A) obligations, the FDA instructed Merck to include a warning about such fractures in its Fosamax drug labels. Id., at 526-534.
Thus, for years the FDA was: aware of this issue, communicating with drug manufacturers, studying all relevant information, and instructing healthcare professionals and patients alike to continue to use Fosamax as directed. For this reason, the FDA itself, speaking through the Solicitor General, takes the position that the FDA's decision not to require a label change prior to October 2010 reflected the FDA's "determin[ation]" that a new warning "should [not] be included in the labeling of the drug," § 355(o )(4)(A). See Brief for United States as Amicus Curiae 30, 33-34.
For these reasons, I concur in the judgment only.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U. S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

In 2007, Congress "granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval," but even after this amendment, brand-name-drug "manufacturers remain responsible for updating their labels." Wyeth , 555 U. S. at 567-568, 129 S.Ct. 1187 ; see 21 U.S.C. § 355(o )(4). As I understand the Court's opinion, if proper agency actions pursuant to this amendment, or other federal law, "prohibited the drug manufacturer from ... satisfy[ing] state law," state law would be pre-empted under our impossibility precedents regardless of whether the manufacturer "show[ed] that it fully informed the FDA of the justifications for the warning required by state law." Ante, at 1678; see, e.g., Wyeth , 555 U. S. at 576, 129 S.Ct. 1187 ; id., at 582, 129 S.Ct. 1187 (BREYER, J., concurring). Of course, the only proper agency actions are those "that are set forth in, or necessarily follow from, the statutory text," and they must have the force of law to be pre-emptive. Id., at 586, 129 S.Ct. 1187 (opinion of THOMAS, J.). I am aware of no such agency action here that prevented Merck from complying with state law.

Prior to October 2018, § 355(o )(4)(A) 's language contained slight differences not relevant here. See Substance Use-Disorder Prevention That Promotes Opioid Recovery and Treatment for Patients and Communities Act, Pub. L. 115-271, § 3041(b), 132 Stat. 3942 -3943, effective Oct. 24, 2018.