## UNITED STATES v. GRIDLEY.

· (Circuit Court, D. Idaho, Central Division. February 20, 1911.)

1. PUBLIC LANDS (§ 116*)—ISSUANCE OF PATENT—CONCLUSIVENESS.

A patent issued to an assignee of a soldier's additional homestead scrip does not have the effect of a judgment, and the government is not precluded from ascertaining such rights as it may have in case the issuance of the patent was induced by fraud or was the result of mistake, though the officers of the government made an investigation of the rights of the parties so as to relieve them from a charge of negligently recognizing the claim and issuing a patent thereon.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 325; Dec. Dig. § 116.*]

2. PUBLIC LANDS (§ 138*)—BONA FIDE PURCHASER—WHO IS.

Where the government has by patent conveyed the legal title to land, and a purchaser from its grantee is vested with the legal title, though he purchased from the entryman before patent, but after final proof, and the purchase was made in good faith and for a valuable consideration without knowledge of any fraud of the entryman, the government may not sue to cancel the patent for the entryman's fraud.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. § 138.*]

3. PUBLIC LANDS (§ 138*)—BONA FIDE PURCHASER—WHO IS.

A purchaser in good faith and for value of a soldier's additional homestead scrip, which merely consists of ex parte declarations under oath by persons having no relation to the government of facts which, if true, disclose a right to receive an additional homestead, acquires only a claim which becomes effective if the scrip be valid, and he is not, as against the government issuing to him a patent for an additional homestead on the faith of the validity of the scrip, a bona fide purchaser, and the government, on discovering that the scrip is a forgery, may sue to cancel the patent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. § 138.*]

Suit by the United States of America by Charles E. Gridley to set aside a patent to land. Decree for complainant.

C. H. Lingenfelter, U. S. Atty.
Sullivan & Sullivan, for defendant.

DIETRICH, District Judge. The United States brings this suit to set aside a patent to 120 acres of land; the same having been issued to the defendant, Charles E. Gridley. The facts as disclosed by the stipulation and the undisputed testimony of the defendant are: That one William J. Taylor was entitled to enter a soldier's additional homestead, under the provisions of section 2306 of the Revised Statutes of the United States. Another person, for a valuable consideration, on April 17, 1905, sold and transferred what purported to be this right to one D. N. Clark, of Washington, D. C., the assignment being in due form and properly attested and acknowledged, as required by the rules and regulations of the United States Land Office, and being accompanied by an affidavit in the name of William J. Taylor, setting forth what purported to be the facts of his service in the United States army, together with affidavits of other persons who claimed to have personal knowledge of the facts therein stated. In short, the papers appeared in due form to constitute what is commonly known as "soldier's additional homestead scrip," but they were all executed without the knowledge or authority of William J. Taylor, the soldier. On June 17, 1905, Clark, by an assignment duly executed, transferred the scrip to the defendant, through a broker or agent residing at Helena, Mont. The defendant at that time resided, and still resides, in Blaine county, Idaho, and was unacquainted with any of the parties. He negotiated the purchase by correspondence through the United States mail, paying for the scrip at the rate of $8.25 an acre. After its purchase, he presented it at the United States Land Office at Hailey, Idaho, on August 3, 1905, together with an application for the tract in controversy, which at that time was public land subject to entry; and in all respects he complied with the law and the rules and regulations of the Land Office relating to such entries. The papers were in due course forwarded by the officers of the local land office to the General Land Office at Washington for examination, and on June 11, 1906, the register and receiver issued to the defendant a final certificate. Between said 3d day of August, 1905, and April 19, 1907, the officers of the General Land Office made inquiry and examination in the usual course of their duties in such matters, as to the truth of the facts set forth in the assignment of Taylor, including an inquiry through various departments of the United States for the purpose of ascertaining the truth of the statements of claimants, and whether or not William J. Taylor was in truth and in fact a beneficiary as claimed by him under section 2306, and whether the facts set forth in his affidavits were true or not. Investigation was also carried on with the Adjutant General's office, at Jefferson City, Mo., with the military secretary of the War Department, with the auditor of the War Department and with the Bureau of Pensions. Inquiries were made as to the truth of the statements contained in the affidavits of said pre-

186 F.—35

tended Taylor and as to mustering-in, service, and discharge from the United States Army during the Rebellion, of William J. Taylor in Company M., Thirteenth Regiment, Missouri Volunteer Cavalry. It also included a comparison of the signatures of the real William J. Taylor, soldier, and the William J. Taylor claiming to be a beneficiary, a tracing of the signature of the Taylor who had served in the army being furnished by the War Department. The inquiry also covered the whereabouts of William J. Taylor, especially on the 17th day of April, 1905, when he made the assignment to Clark, and the office of the Bureau of Pensions, on January 8, 1906, advised the Commissioner of the General Land Office that in their pension records they had the deposition of one who had served in the same company with Taylor, and had known him in boyhood and lived in the same neighborhood; and it further included facts concerning the marriage, size of family, nativity, address, and residence of said William J. Taylor, since March 13, 1871. Thereupon, on the 19th day of April, 1907, patent was issued to the defendant, the patent containing the following clause:

· "The claim of Charles E. Gridley, assignee by mesne conveyances of William J. Taylor, has been established and duly consummated in conformity to law."

The defendant was not aware of, and did not know or suspect, or have any reason to suspect, that the scrip was spurious until some time after patent had issued to him, and about the time the suit was commenced. So far as disclosed by the record, he acted in perfect good faith, and paid a fair price for the scrip.

[1] The first point urged by the defendant is that by reason of the proceedings taken in the Land Office after the defendant presented the scrip, including the investigation made by the officers of the department, the patent is to be regarded as in effect a judgment in defendant's favor, and that the issues here presented are therefore res adjudicata. It is difficult, and perhaps impossible, with entire accuracy to formulate a statement of the distinction which, under all circumstances, differentiates a case where the patent operates as a conclusive judgment and where it is subject to judicial inquiry and to be set aside if found to have been issued by reason of fraud or mistake; but I am not convinced that the present case falls within the former class. In United States v. Minor, 114 U. S. 233, 5 Sup. Ct. 836, 29 L. Ed. 110, a discussion of the question is concluded with the following language:

·"But in proceedings like the present, wholly ex parte, no contest, no adversary proceedings, no reason to suspect fraud, but where the patent is the result of nothing but fraud and perjury, it is enough to hold that it conveys the legal title, and it would be going quite too far to say that it cannot be assailed by a proceeding in equity and set aside as void, if the fraud is proved and there are no innocent holders for value."

. . In no true sense can it be held in the case at bar that there was an adversary proceeding in the Land Office. So far as appears, neither the defendant nor the complainant doubted the genuineness of the scrip. The records in the possession of the government disclosed the right of William J. Taylor, the soldier, to an additional homestead entry, and

the statements contained in the affidavits which constitute the scrip were apparently true in all material respects, except as to the identity of the author of the claimant's affidavit. As to that question, the sources of information were as accessible to the defendant as to the officers of the government, and no greater obligation rested upon the latter than upon the former to know the truth. The investigation made by the officers does not go further than to relieve them from a charge of carelessly or negligently recognizing the defendant's claim and issuing the patent. The government is not thereby precluded from asserting such rights as it may have, in case it be true that the issuance of the patent was induced by fraud or was the result of mistake, provided that the defendant is not an innocent purchaser for value.

The second defense is that, notwithstanding the gross fraud of his original assignor, the defendant is protected against a suit for cancellation by the fact that he is a bona fide purchaser for value. Of the existence of such a rule there can be no question, for it is firmly established by an unbroken line of authority; but the plaintiff denies its application to the present case. Conceding that the defendant acted in good faith and was conscious of no wrongdoing, it still asserts that the rule is not broad enough to afford him protection because it is confined to cases where the defendant in his purchase, and by the conveyance to him, acquires the legal title; in other words, a purchase in good faith can be only of the legal title from one who is at the time invested therewith.

It may be remarked in passing that the case is not like that of Moffat v. United States, 112 U. S. 24, 5 Sup. Ct. 10, 28 L. Ed. 623, where a patent was issued to a fictitious person. In such a case, there being no grantee in esse, the patent is inoperative, and is equivalent only to a declaration of the government that it conveys the land to no one. Here the grant was to the defendant himself, a real person, and the patent was not rendered ineffective by the false impersonation or forgery by which its issuance was induced. That it conveyed to the defendant the legal title, or that he now holds the same, is, I think, not open to question, nor is it requisite to the defense of purchase in good faith that the purchase should have been from one who at the time held the legal title. It may be necessary that the defendant be the holder of such title at the time the suit is commenced, but the date of the acquisition is not always of vital importance. Plaintiff's statement of the rule is in this particular substantially like that found in the headnote to Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157, which was criticised and repudiated by the court in United States v. Detroit Lumber Company, 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, and held not to be an accurate statement of the law.

[2] By the latter decision, it is established that, where the government has by patent conveyed the legal title, it cannot successfully maintain a suit against a purchaser from its grantee to cancel the patent for the fraud of the entryman, where the defendant is at the time the suit is brought vested with the legal title, even though it purchased from the entryman before patent, but after final proof; provided, of course, the purchase was in good faith and a valuable con-

sideration was paid without knowledge of the fraud. The rule is well stated in the opinion rendered in the Detroit Lumber Company Case by the Circuit Court of Appeals (131 Fed. 668, 67 C. C. A. 1), where it is said:

"When the patents had issued, the power of the Land Department had ceased, and the Detroit Company's position was conditioned by every attribute of that of a bona fide purchaser. Conceding that the indispensable elements of such a defense are absence of notice of the fraud or defect, good faith, payment of value, and the legal estate, it is not material at what time or in what order the purchaser acquires them. It is only necessary that they all concur in him at the same time. It is indispensable to this defense that the consideration should be paid before notice of the defect; but it is not essential that it should be paid before or at the time the title is conveyed. It is sufficient if the payment is completed at any time before notice of the defect is received. * * * Finally, counsel for the government say—and this seems to be the argument upon which they most implicitly rely—that acquisition of the legal title was indispensable to the defense of a bona fide purchase; that the legal title to all but 13 of the 44 tracts was in the United States when the Detroit Company purchased; that the title to the timber on these 31 tracts which the Detroit Company bought was a mere equitable title evidenced by the final receipts; that these receipts constituted notice to the Detroit Company that they had been secured by the fraud and perjury of the entrymen and entrywomen, and that the company could not divest itself of this notice by the subsequent issue of the patents and the acquisition of the legal title which inured to it thereunder. There are many reasons why this argument is not persuasive. In the first place, conceding for the present, without admitting or deciding this to be the law, that a legal estate in the vendee is an essential condition of the defense of a bona fide purchase, such an estate vested in the Detroit Company before it received any notice of the alleged fraud. In the second place, the patents, when issued, related back to the dates of the applications upon which they were founded, and vested the legal estate in the timber in the Detroit Company as of the date of its purchase from the Martin Company, and before it had notice of the fraud. And, in the third place, the Detroit Company was an innocent purchaser for value, in good faith, of the equitable title to the timber, evidenced by the final receipts, and the legal title vested in it by the issuance of the patents before the government assailed either."

But, while the rule thus stated is more liberal than that now contended for by the government, is it broad enough to protect the defendant here? Ordinarily, where the defense of purchase in good faith has been set up to protect the defendant against a suit of this character, the purchase appears to have been made after the issuance of patent. In exceptional cases, it was after the delivery of the final receipt at a time when the entryman had fully performed all of the conditions precedent to his right to receive patent. The equitable title had been fully earned, and the proper officers of the government had issued a certificate as evidence thereof. In either case, the vendor had title, either legal or equitable, and the representatives of the government had placed in his hands the evidence of that fact. In making payment therefore the purchaser paid for either a legal or equitable title, which was at the time of the payment vested in the vendor, who held authentic evidence thereof in the form of either a final receipt or a patent.

[3] A different condition is presented by the record in this case. When the defendant purchased and made payment for the scrip, his vendor was the owner of neither the legal nor the equitable title to the

land in question. The scrip, as it is called, consisted of nothing more than ex parte declarations under oath, by persons having no official relation to the government, of certain facts, which, if true, disclosed a right on the part of the claimant to receive title to a certain amount of land. The papers might or might not be of value, depending upon the truthfulness of the statements therein contained. The mere execution of the affidavits and the assignment of the claim initiated no right, either equitable or legal, to any tract of land. The right was of no, greater dignity than that of a qualified citizen to pre-empt or to enter under the homestead laws a certain amount of land. The claim became effective to initiate title only upon proper application in the United States Land Office for a specific tract. The defendant bought and paid value for what in good faith he believed to be a valid right, which, however, turned out to be a worthless simulation. He received nothing. The purchase complete, he held in his hands a mere forged instrument, a counterfeit, totally devoid of real value. This he presented to the proper officers in the belief that it was genuine, and, acting upon a like belief, the officers issued to him the patent. There was no valuable consideration. The valuable consideration essential to the defense of a purchase in good faith was paid by the defendant, not for any title, either equitable or legal, which had been transferred by the government to the holder of the scrip, but for a claim which was without merit, for scrip which was mere counterfeit, a forgery. The defendant himself became the actor in inducing the government to convey to him a title which it was under no obligation to convey. He was acting in good faith, it is true, but his position is not materially different from that of one who, through mutual mistake of the parties, makes payment for property received by a counterfeit or by a forged note or bill. Assuming that it was extinguishing its obligation to convey to the soldier, William J. Taylor, a hundred and twenty acres of land, the government issued to the defendant, who falsely, though unwittingly, represented himself to be the assignee of William J. Taylor, the soldier, the patent in question. Profound though our sympathy for the defendant may be on account of the despicable fraud of which he became the victim, his loss is a misfortune for which the government is in no wise responsible. When he parted with the consideration upon which he now relies as an element of this defense, there was no relation of privity between him or his vendor and the government. He was not misled by any action or representation on the part of any officer of the government. His assignor had not been clothed by the government with apparent title or any indicia of title.

Upon principle I am unable to distinguish the case from one where payment for property is made by a forged instrument; and the general rule in such cases is that, where the parties are ignorant of the forgery, the subject of the transfer, in equity and good conscience, continues to be the property of the vendor. "One who, by presenting forged paper to a bank, procures the payment of the amount thereof to him, even if he makes no express warranty, in law represents that the paper is genuine, and, if the payment is made in ignorance of the forgery, is liable to an action by the bank to recover back the money

which, in equity and good conscience, has never ceased to be its property. It is not a case in which a consideration which has once existed fails by subsequent election or other act of either party, or of a third person; but there is never at any stage of the transaction any consideration for the payment." Leather Manufacturers' Bank v. Merchants' Bank, 128 U. S. 34, 9 Sup. Ct. 4, 32 L. Ed. 342. In Hammond v. Allen, 36 U. S. 63, 9 L. Ed. 633, the defendant had employed the plaintiff to prosecute a claim which he held against the Portuguese government, agreeing to pay him a large compensation. At the time the agreement was entered into both parties were ignorant of the fact that the claim had already been allowed. The case was brought to cancel the contract. The court said:

"Allen is not chargeable with fraud in entering into the contract, nor in using the most persevering efforts to get possession of the installment paid. That the contract was entered into by both parties under a mistake is unquestionable. Neither of them knew that the Portuguese government had allowed the claim. Can a court of equity enforce such a contract? Can it refuse to cancel it? That the agreement is without consideration is clear. * * * Suppose a life estate in land be sold, and at the time of the sale the estate is terminated by the death of the person in whom the right vested, would not a court of equity relieve the purchaser? If the vendor knew of the death, relief would be given on the ground of fraud. If he did not know it, on the ground of mistake. In either case would it not be gross injustice to enforce the payment of the consideration? If a horse be sold which is dead, though believed to be living by both parties, can the purchaser be compelled to pay the consideration? These are cases in which the parties enter into the contract under a material mistake as to the subject-matter of it. In the first case the vendor intended to sell, and the vendee to purchase, a subsisting title, but which in fact did not exist; and, in the second, a horse was believed to be living, but which was in fact dead. If in either of these cases the payment of the purchase money should be required, it would be a payment without the shadow of consideration, and no court of equity is believed ever to have sanctioned such principle."

It is not thought to be material that here the government transferred property instead of paying money. Both it and the defendant, acting under a mutual mistake, assumed that the transfer was to extinguish an existing obligation, namely, the obligation of the government to convey to William J. Taylor, the soldier, a certain amount of land. Instead of receiving the consideration which both parties understood was to be paid, it received nothing at all. Its obligation remained unextinguished and undiminished.

The principle is elaborately discussed and illustrated in Terry v. Bissell, 26 Conn. 23. It was there said:

"Suppose the defendants had proposed to sell, and had sold, a bar of metal as gold, which turned out to be mere dross, colored and disguised, without a particle of gold, or a barrel of flour which was examined on the surface, but below was mere sawdust or gravel, or a barrel of beef which turned out to have one layer of beef and the rest was brick bats and stones, or a box of chisels which turned out to be scrap iron, would the seller be permitted to insist that it was a sale and keep his money? * * * In some of the cases which we have cited and commented on, it is said that where there is a mutual mistake of fact there is not a sale, because there is a failure of consideration; in others, because there is an implied warranty of genuineness, or of kind and description; and still in others because the thing is not in existence. But the true idea is, as I think, that, if the thing contracted for is essentially nonexistent, there is nothing to sell and transfer, no subject-matter for an intelligent and perfect understanding between

the parties. The parties may undoubtedly bind themselves by express agreements as they please, but where the thing intended to be sold and transferred does not exist, as if the horse be dead, the ship lost, the goods burnt, or the instrument forged, there can be no sale, unless we adopt a new definition of that legal term."

In 2 Pomeroy's Equity Jurisprudence (3d Ed.) p. 870, the learned author says:

"Cancellation is appropriate when there is an apparently valid written agreement or transaction embodied in writing, while in fact, by reason of mistake of both or one of the parties, either no agreement at all has really been made, since the minds of both parties have failed to meet upon the same matters, or else the agreement or transaction is different with respect to its subject-matter or terms from that which was intended."

See, also, Crowe et al. v. Lewin, 95 N. Y. 423; Fritzler v. Robinson, 70 Iowa, 500, 31 N. W. 61; Geib v. Reynolds, 35 Minn. 331, 28 N. W. 923; Fleetwood v. Brown, 109 Ind. 567, 9 N. E. 352, 11 N. E. 779.

The case of United States v. Sierra Nevada Wood & Lumber Company, 79 Fed. 691, was much relied upon at the argument by the defendant as being directly in point because of the similarity of facts; and in the respect that there, as here, the fraud consisted in the forgery of scrip or land warrants, the cases are not essentially different, but the distinction which is here thought to be controlling undoubtedly exists, as appears in a single sentence of the opinion. "Clear and strong," says Judge Hawley, "as the equity of the United States in these cases must be admitted to be, it is self-evident that it is no clearer or stronger than that of the innocent purchasers (the defendants) of the legal title to the lands, who paid a valuable consideration therefor, and have made valuable improvements thereon, in good faith, without any notice of the illegal acts committed by the person or persons who wrongfully and fraudulently obtained the patent from the United States. * * * They relied, and had a right to rely, upon the patent issued by the government, in a case where it had the unquestioned jurisdiction and right to issue the patent. The fact that the government was imposed upon was not their fault."

It is clear that a different case is here presented, for the defendant's assignor had neither title nor evidence of title. The defendant bought the spurious scrip at his peril. The government had no responsibility in the premises. In presenting it and asking that the land in controversy be conveyed to him, he must be understood to have represented that it was genuine, that it was what it purported to be, that it was in truth and in fact the right of the soldier, William J. Taylor, "that it was gold, and not merely gilded dross."

It follows that the relief prayed for must be granted, and a decree will be entered accordingly.